## LANDON, DISTRICT DIRECTOR OF THE IMMI-GRATION AND NATURALIZATION SERVICE *v.* PLASENCIA

No. 81–129. Argued October 5, 1982—Decided November 15, 1982

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. MARSHALL, J., filed an opinion concurring in part and dissenting in part, *post*, p. 37.

*Elliott Schulder* argued the cause for petitioner. With him on the briefs were *Solicitor General Lee* and *Deputy Solicitor General Geller*.

*Gary H. Manulkin* argued the cause and filed a brief for respondent.

JUSTICE O'CONNOR delivered the opinion of the Court.

Following an exclusion hearing, the Immigration and Naturalization Service (INS) denied the respondent, a permanent resident alien, admission to the United States when she attempted to return from a brief visit abroad. Reviewing the respondent's subsequent petition for a writ of habeas corpus, the Court of Appeals vacated the decision, holding that the question whether the respondent was attempting to "enter" the United States could be litigated only in a deportation hearing and not in an exclusion hearing. Because we conclude that the INS has statutory authority to proceed in an exclusion hearing, we reverse the judgment below. We remand to allow the Court of Appeals to consider whether the respondent, a permanent resident alien, was accorded due process at the exclusion hearing.

# I

Respondent Maria Antonieta Plasencia, a citizen of El Salvador, entered the United States as a permanent resident alien in March 1970. She established a home in Los Angeles with her husband, a United States citizen, and their minor children. On June 27, 1975, she and her husband traveled to Tijuana, Mexico. During their brief stay in Mexico, they met with several Mexican and Salvadoran nationals and made arrangements to assist their illegal entry into the United States. She agreed to transport the aliens to Los Angeles and furnished some of the aliens with alien registration receipt cards that belonged to her children. When she and her husband attempted to cross the international border at 9:27 on the evening of June 29, 1975, an INS officer at the port of entry found six nonresident aliens in the Plasencias' car. The INS detained the respondent for further inquiry pursuant to § 235(b) of the Immigration and Nationality Act of 1952 (Act), 66 Stat. 182, as amended, 8 U. S. C. § 1101 *et seq.*[1] In a notice dated June 30, 1975, the INS charged her under § 212(a)(31) of the Act, 8 U. S. C. § 1182(a)(31), which provides for the exclusion of any alien seeking admission "who at any time shall have, knowingly and for gain, encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law,"

---

[1] Section 235, as set forth in 8 U. S. C. § 1225, provides in part:

(a) "The inspection . . . of aliens (including alien crewmen) seeking admission or readmission to . . . the United States shall be conducted by immigration officers, except as otherwise provided in regard to special inquiry officers. All aliens arriving at ports of the United States shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as he may prescribe. . . ."

(b) "Every alien . . . who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer."

and gave notice that it would hold an exclusion hearing at 11 a. m. on June 30, 1975.[2]

An Immigration Law Judge conducted the scheduled exclusion hearing. After hearing testimony from the respondent, her husband, and three of the aliens found in the Plasencias' car, the judge found "clear, convincing and unequivocal" evidence that the respondent did "knowingly and for gain encourage, induce, assist, abet, or aid nonresident aliens" to enter or try to enter the United States in violation of law. He also found that the respondent's trip to Mexico was a "meaningful departure" from the United States and that her return to this country was therefore an "entry" within the meaning of § 101(a)(13), 8 U. S. C. § 1101(a)(13).[3]

---

[2] The hearing was authorized by § 236(a), which, as set forth in 8 U. S. C. § 1226(a), provides:

"A special inquiry officer shall conduct proceedings under this section, administer oaths, present and receive evidence, and interrogate, examine, and cross-examine the alien or witnesses. He shall have authority in any case to determine whether an arriving alien who has been detained for further inquiry under section 1225 of this title shall be allowed to enter or shall be excluded and deported. The determination of such special inquiry officer shall be based only on the evidence produced at the inquiry. . . . Proceedings before a special inquiry officer under this section shall be conducted in accordance with this section, the applicable provisions of sections 1225 and 1375(b) of this title, and such regulations as the Attorney General shall prescribe, and shall be the sole and exclusive procedure for determining admissibility of a person to the United States under the provisions of this section. . . . A complete record of the proceedings and of all testimony and evidence produced at such inquiry, shall be kept."

[3] Section 101(a)(13), 8 U. S. C. § 1101(a)(13), defines "entry" as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary: *Provided,* That no person whose departure from the United

On the basis of these findings, he ordered her "excluded and deported."

After the Board of Immigration Appeals (BIA) dismissed her administrative appeal and denied her motion to reopen the proceeding, the respondent filed a petition for a writ of habeas corpus in the United States District Court, seeking release from the exclusion and deportation order. The Magistrate initially proposed a finding that, on the basis of evidence adduced at the exclusion hearing, "a meaningful departure did not occur . . . and that therefore [the respondent] is entitled to a deportation hearing." After considering the Government's objections, the Magistrate declared that the Government could relitigate the question of "entry" at the deportation hearing. The District Court adopted the Magistrate's final report and recommendation and vacated the decision of the BIA, instructing the INS to proceed against respondent, if at all, only in deportation proceedings.

The Court of Appeals for the Ninth Circuit affirmed. *Plasencia* v. *Sureck*, 637 F. 2d 1286 (1980).

## II

The immigration laws create two types of proceedings in which aliens can be denied the hospitality of the United States: deportation hearings and exclusion hearings. See generally *Leng May Ma* v. *Barber*, 357 U. S. 185, 187 (1958). The deportation hearing is the usual means of proceeding against an alien already physically in the United States, and the exclusion hearing is the usual means of proceeding against an alien outside the United States seeking admission. The two types of proceedings differ in a number of ways. See generally *Maldonado-Sandoval* v. *INS*, 518 F. 2d 278, 280, n. 3 (CA9 1975). An exclusion proceeding is usually held at the port of entry, while a deportation hearing is usually held near the residence of the alien within the United

States was occasioned by deportation proceedings, extradition, or other legal process shall be held to be entitled to such exception."

States, see 1A C. Gordon & H. Rosenfield, Immigration Law and Procedure § 5.6c (rev. ed. 1981). The regulations of the Attorney General, issued under the authority of § 242(b), 8 U. S. C. § 1252(b), require in most deportation proceedings that the alien be given seven days' notice of the charges against him, 8 CFR § 242.1(b) (1982), while there is no requirement of advance notice of the charges for an alien subject to exclusion proceedings. Indeed, the BIA has held that, "as long as the applicant is informed of the issues confronting him at some point in the hearing, and he is given a reasonable opportunity to meet them," no further notice is necessary. *In re Salazar*, 17 I. & N. Dec. 167, 169 (1979). Also, if the INS prevails in a deportation proceeding, the alien may appeal directly to the court of appeals, § 106(a), 75 Stat. 651, as amended, 8 U. S. C. § 1105a(a) (1976 ed. and Supp. V), while the alien can challenge an exclusion order only by a petition for a writ of habeas corpus, § 106(b), 75 Stat. 653, 8 U. S. C. § 1105a(b). Finally, the alien who loses his right to reside in the United States in a deportation hearing has a number of substantive rights not available to the alien who is denied admission in an exclusion proceeding: he can, within certain limits, designate the country of deportation, § 243(a), 8 U. S. C. § 1253(a) (1976 ed. and Supp. V); he may be able to depart voluntarily, § 244(e), 8 U. S. C. § 1254(e) (1976 ed., Supp. V), avoiding both the stigma of deportation, § 242(b), 8 U. S. C. § 1252(b) (1976 ed. and Supp. V), and the limitations on his selection of destination, § 243(a), 8 U. S. C. § 1253(a) (1976 ed. and Supp. V);[4] or he

---

[4] Voluntary departure for an alien who would otherwise be deported also means that he will not be subject to § 212(a)(17), 8 U. S. C. § 1182(a)(17), which, at the time of Plasencia's hearing, required aliens who had once been deported to seek prior approval of the Attorney General before reentering. There was no comparable requirement of prior approval for aliens who had been excluded and sought again to enter more than one year later. § 212(a)(16), 8 U. S. C. § 1182(a)(16). The requirement of prior approval for deported aliens now applies only within five years of de-

can seek suspension of deportation, § 242(e), 8 U. S. C. § 1252(e) (1976 ed., Supp. V).

The respondent contends that she was entitled to have the question of her admissibility litigated in a deportation hearing, where she would be the beneficiary of the procedural protections and the substantive rights outlined above. Our analysis of whether she is entitled to a deportation rather than an exclusion hearing begins with the language of the Act. Section 235(a) of the Act, 8 U. S. C. § 1225(a), permits the INS to examine *"[a]ll* aliens" who seek "admission or *readmission* to" the United States and empowers immigration officers to take evidence concerning the privilege of any person suspected of being an alien "to enter, *reenter*, pass through, or reside" in the United States. (Emphasis added.) Moreover, "every alien" who does not appear "to be clearly and beyond a doubt entitled to land shall be detained" for further inquiry. § 235(b). If an alien is so detained, the Act directs the special inquiry officer to determine whether the arriving alien "shall be allowed to enter or shall be excluded and deported." § 236(a), 8 U. S. C. § 1226(a). The proceeding before that officer, the exclusion hearing, is by statute "the sole and exclusive procedure for determining admissibility of a person to the United States . . . ." *Ibid.*

The Act's legislative history also emphasizes the singular role of exclusion hearings in determining whether an alien should be admitted. The Reports of both the House and Senate state:

> "The special inquiry officer is empowered to determine whether an alien detained for further inquiry shall be excluded and deported or shall be allowed to enter after he has given the alien a hearing. The procedure established in the bill is made the sole and exclusive procedure for determining the admissibility of a person to the

portation. 95 Stat. 1612, § 212(a)(17), 8 U. S. C. § 1182(a)(17) (1976 ed., Supp. V).

United States." S. Rep. No. 1137, 82d Cong., 2d Sess., 29 (1952); H. R. Rep. No. 1365, 82d Cong., 2d Sess., 56 (1952).

The language and history of the Act thus clearly reflect a congressional intent that, whether or not the alien is a permanent resident, admissibility shall be determined in an exclusion hearing. Nothing in the statutory language or the legislative history suggests that the respondent's status as a permanent resident entitles her to a suspension of the exclusion hearing or requires the INS to proceed only through a deportation hearing. Under the terms of the Act, the INS properly proceeded in an exclusion hearing to determine whether respondent was attempting to "enter" the United States[5] and whether she was excludable.

## III

To avoid the impact of the statute, the respondent contends, and the Court of Appeals agreed, that unless she was "entering," she was not subject to exclusion proceedings, and that prior decisions of this Court indicate that she is entitled to have the question of "entry" decided in deportation proceedings.

The parties agree that only "entering" aliens are subject to exclusion. See Brief for Petitioner 19. That view accords with the language of the statute, which describes the exclusion hearing as one to determine whether the applicant "shall be allowed to *enter* or shall be excluded and deported." § 236(a), 8 U. S. C. § 1226(a) (emphasis added). But the respondent's contention that the question of entry can be determined only in deportation proceedings reflects a misconception of our decisions.

In *Rosenberg* v. *Fleuti*, 374 U. S. 449 (1963), we faced the question whether a resident alien's return from an afternoon

---

[5] Apparently the practice of the INS is to determine this question in exclusion proceedings. See *In re Leal*, 15 I. & N. Dec. 477, 478–479 (BIA 1975); *In re Becerra-Miranda*, 12 I. & N. Dec. 358, 362–363 (BIA 1967).

trip across the border was an "entry" for immigration law purposes. The definition of that term was the same then as it is now: it means "any coming of an alien into the United States . . . except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him . . . ." § 101(a)(13), 8 U. S. C. § 1101(a)(13). We held in *Fleuti* that the "intent exception" refers to an intent to depart in a "manner which can be regarded as meaningfully interruptive of the alien's permanent residence." 374 U.S, at 462. Thus, an "innocent, casual, and brief excursion" by a resident alien outside this country's borders would not subject him to the consequences of an "entry" on his return. *Ibid.* If, however, "the purpose of leaving the country is to accomplish some object which is itself contrary to some policy reflected in our immigration laws, it would appear that the interruption of residence thereby occurring would properly be regarded as meaningful." *Ibid.* That distinction both protects resident aliens from "unsuspected risks and unintended consequences of . . . a wholly innocent action," *ibid.*, and gives effect to the language of § 101(a)(13).[6]

---

[6] Section 101(a)(13), 8 U. S. C. § 1101(a)(13), which defines "entry," was enacted in 1952 in response to the harsh results visited upon resident aliens by earlier restrictive interpretations of the term. Both the House and Senate Reports contained identical explanatory language:

"Normally an entry occurs when the alien crosses the borders of the United States and makes a physical entry, and the question of whether an entry has been made is susceptible of a precise determination. However, for the purposes of determining the effect of a subsequent entry upon the status of an alien who has previously entered the United States and resided therein, the preciseness of the term 'entry' has not been found to be as apparent. Earlier judicial constructions of the term in the immigration laws, as set forth in *Volpe* v. *Smith* (289 U. S. 422 (1933)), generally held that the

The Government has argued in this case that Plasencia violated the immigration laws by attempting to smuggle aliens for gain. Therefore, her departure was "meaningfully interruptive" of her residence, she was attempting an "entry," and she was subject to exclusion proceedings. And, the Government urges, under § 212(a)(31), 8 U. S. C. § 1182(a)(31), she was excludable because she had attempted to smuggle aliens for gain. Plasencia, on the other hand, argues that it would "violat[e] both the scope and spirit," Brief for Respondent 15, of *Fleuti* to permit the INS to litigate questions of "entry" in exclusion proceedings.

The Court of Appeals viewed *Fleuti* as a deportation case rather than an exclusion case, 637 F. 2d, at 1288, and therefore not relevant in deciding whether the question of "entry" could be determined in exclusion proceedings. For guidance on that decision, the Court of Appeals turned to *Kwong Hai Chew v. Colding*, 344 U. S. 590 (1953), which it read to hold that a resident alien returning from a brief trip "could not be

term 'entry' included any coming of an alien from a foreign country to the United States whether such coming be the first or a subsequent one. More recently, the courts have departed from the rigidity of that rule and have recognized that an alien does not make an entry upon his return to the United States from a foreign country where he had no intent to leave the United States (*Di Pasquale v. Karnuth*, 158 F. 2d 878 (C. C. A. 2d 1947)), or did not leave the country voluntarily (*Delgadillo v. Carmichael*, 332 U. S. 388 (1947)). The bill defines the term 'entry' as precisely as practicable, giving due recognition to the judicial precedents. Thus any coming of an alien from a foreign port or place or an outlying possession into the United States is to be considered an entry, whether voluntary or otherwise, unless the Attorney General is satisfied that the departure of the alien, other than a deportee, from this country was unintentional or was not voluntary." S. Rep. No. 1137, 82d Cong., 2d Sess., 4 (1952); H. R. Rep. No. 1365, 82d Cong., 2d Sess., 32 (1952).

In *Di Pasquale*, the court refused to allow a deportation that depended upon an "entry" that occurred after an overnight train on which an alien was a passenger passed through Canada on its way from Buffalo to Detroit. In *Delgadillo*, the Court refused to define as an "entry" the return of an alien taken to Cuba to recuperate after the merchant ship on which he sailed was torpedoed in the Caribbean during World War II.

excluded without the procedural due process to which he would have been entitled had he never left the country"— *i. e.*, in this case, a deportation proceeding. 637 F. 2d, at 1288. The court concluded that Plasencia was entitled to litigate her admissibility in deportation proceedings. It would be "circular" and "unfair," thought the court, to allow the INS to litigate the question of "entry" in exclusion proceedings when that question also went to the merits of the respondent's admissibility. *Id.*, at 1288–1289.

We disagree. The reasoning of *Chew* was only that a resident alien returning from a brief trip has a right to due process just as would a continuously present resident alien. It does not create a right to identical treatment for these two differently situated groups of aliens.[7] As the Ninth Circuit seemed to recognize, if the respondent here was making an "entry," she would be subject to exclusion proceedings. It is no more "circular" to allow the immigration judge in the exclusion proceeding to determine whether the alien is making an entry than it is for any court to decide that it has jurisdiction when the facts relevant to the determination of jurisdiction are also relevant to the merits. Thus, in *United States v. Sing Tuck*, 194 U. S. 161 (1904), this Court held that an immigration inspector could make a determination whether an applicant for admission was an alien or a citizen, although only aliens were subject to exclusion. Cf. *Land v. Dollar*, 330 U. S. 731, 739 (1947) (district court has jurisdiction to determine its jurisdiction by proceeding to a decision on the merits). Nor is it in any way "unfair" to decide the question of entry in exclusion proceedings as long as those proceedings themselves are fair. Finally, the use of exclusion proceed-

---

[7] Indeed, we expressly declined to reach the question whether Chew himself was entitled to a deportation proceeding. We stated: "From a constitutional point of view, he is entitled to due process without regard to whether or not, for immigration purposes, he is to be treated as an entrant alien, and we do not now reach the question whether he is to be so treated." 344 U. S., at 600.

32

ings violates neither the "scope" nor the "spirit" of *Fleuti*. As the Court of Appeals held, that case only defined "entry" and did not designate the forum for deciding questions of entry. The statutory scheme is clear: Congress intended that the determinations of both "entry" and the existence of grounds for exclusion could be made at an exclusion hearing.

## IV

Our determination that the respondent is not entitled to a deportation proceeding does not, however, resolve this case. In challenging her exclusion in the District Court, Plasencia argued not only that she was entitled to a deportation proceeding but also that she was denied due process in her exclusion hearing. See App. 5, ¶ 9; Record 19, 20, 23. We agree with Plasencia that under the circumstances of this case, she can invoke the Due Process Clause on returning to this country, although we do not decide the contours of the process that is due or whether the process accorded Plasencia was insufficient.

This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative. See, *e. g.*, *United States ex rel. Knauff* v. *Shaughnessy*, 338 U. S. 537, 542 (1950); *Nishimura Ekiu* v. *United States*, 142 U. S. 651, 659–660 (1892). Our recent decisions confirm that view. See, *e. g.*, *Fiallo* v. *Bell*, 430 U. S. 787, 792 (1977); *Kleindienst* v. *Mandel*, 408 U. S. 753 (1972). As we explained in *Johnson* v. *Eisentrager*, 339 U. S. 763, 770 (1950), however, once an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly. Our cases have frequently suggested that a continuously present resident alien is entitled to a fair hearing when threatened with deportation, see, *e. g.*, *United States ex rel. Tisi* v. *Tod*, 264 U. S. 131, 133, 134 (1924); *Low Wah Suey* v. *Backus*, 225 U. S. 460,

468 (1912) (hearing may be conclusive "when fairly conducted"); see also *Kwong Hai Chew*, 344 U. S., at 598, n. 8, and, although we have only rarely held that the procedures provided by the executive were inadequate, we developed the rule that a continuously present permanent resident alien has a right to due process in such a situation. See, *e. g.*, *United States ex rel. Vajtauer* v. *Commissioner of Immigration*, 273 U. S. 103, 106 (1927); *The Japanese Immigrant Case*, 189 U. S. 86, 100–101 (1903); see also *Wong Yang Sung* v. *McGrath*, 339 U. S. 33, 49–50 (1950); *Bridges* v. *Wixon*, 326 U. S. 135, 153–154 (1945).

The question of the procedures due a returning resident alien arose in *Kwong Hai Chew* v. *Colding, supra.* There, the regulations permitted the exclusion of an arriving alien without a hearing. We interpreted those regulations not to apply to Chew, a permanent resident alien who was returning from a 5-month voyage abroad as a crewman on an American merchant ship. We reasoned that, "[f]or purposes of his constitutional right to due process, we assimilate petitioner's status to that of an alien continuously residing and physically present in the United States." 344 U. S., at 596. Then, to avoid constitutional problems, we construed the regulation as inapplicable. Although the holding was one of regulatory interpretation, the rationale was one of constitutional law. Any doubts that *Chew* recognized constitutional rights in the resident alien returning from a brief trip abroad were dispelled by *Rosenberg* v. *Fleuti*, where we described *Chew* as holding "that the returning resident alien is entitled as a matter of due process to a hearing on the charges underlying any attempt to exclude him." 374 U. S., at 460.

If the permanent resident alien's absence is extended, of course, he may lose his entitlement to "assimilat[ion of his] status," *Kwong Hai Chew* v. *Colding, supra,* at 596, to that of an alien continuously residing and physically present in the United States. In *Shaughnessy* v. *United States ex rel. Mezei*, 345 U. S. 206 (1953), this Court rejected the argu-

ment of an alien who had left the country for some 20 months that he was entitled to due process in assessing his right to admission on his return. We did not suggest that no returning resident alien has a right to due process, for we explicitly reaffirmed *Chew.* We need not now decide the scope of *Mezei;* it does not govern this case, for Plasencia was absent from the country only a few days, and the United States has conceded that she has a right to due process, see Tr. of Oral Arg. 6, 9, 14; Brief for Petitioner 9–10, 20–21.

The constitutional sufficiency of procedures provided in any situation, of course, varies with the circumstances. See, *e. g., Lassiter* v. *Department of Social Services,* 452 U. S. 18, 24–25 (1981); *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S. 1, 12 (1979); *Morrissey* v. *Brewer,* 408 U. S. 471, 481 (1972). In evaluating the procedures in any case, the courts must consider the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures rather than additional or different procedures. *Mathews* v. *Eldridge,* 424 U. S. 319, 334–335 (1976). Plasencia's interest here is, without question, a weighty one. She stands to lose the right "to stay and live and work in this land of freedom," *Bridges* v. *Wixon, supra,* at 154. Further, she may lose the right. to rejoin her immediate family, a right that ranks high among the interests of the individual. See, *e. g., Moore* v. *City of East Cleveland,* 431 U. S. 494, 499, 503–504 (1977) (plurality opinion); *Stanley* v. *Illinois,* 405 U. S. 645, 651 (1972). The Government's interest in efficient administration of the immigration laws at the border also is weighty. Further, it must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the Executive and the Legislature. See, *e. g., Fiallo, supra,* at 792–793; *Knauff, supra,* at 542–543; *The Japanese Immigrant Case, supra,* at 97. The role of the judiciary

is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy. Our previous discussion has shown that Congress did not intend to require the use of deportation procedures in cases such as this one. Thus, it would be improper simply to impose deportation procedures here because the reviewing court may find them preferable. Instead, the courts must evaluate the particular circumstances and determine what procedures would satisfy the minimum requirements of due process on the reentry of a permanent resident alien.

Plasencia questions three aspects of the procedures that the Government employed in depriving her of these interests. First, she contends that the Immigration Law Judge placed the burden of proof upon her. In a later proceeding in *Chew*, the Court of Appeals for the District of Columbia Circuit held, without mention of the Due Process Clause, that, under the law of the case, Chew was entitled to a hearing at which the INS was the moving party and bore the burden of proof. *Kwong Hai Chew* v. *Rogers*, 103 U. S. App. D. C. 228, 257 F. 2d 606 (1958). The BIA has accepted that decision, and although the Act provides that the burden of proof is on the alien in an exclusion proceeding, § 291, 8 U. S. C. § 1361 (1976 ed., Supp. V), the BIA has followed the practice of placing the burden on the Government when the alien is a permanent resident alien. See, *e. g.*, *In re Salazar*, 17 I. & N. Dec., at 169; *In re Kane*, 15 I. & N. Dec. 258, 264 (BIA 1975); *In re Becerra-Miranda*, 12 I. & N. Dec. 358, 363–364, 366 (BIA 1967). There is no explicit statement of the placement of the burden of proof in the Attorney General's regulations or in the Immigration Law Judge's opinion in this case and no finding on the issue below.

Second, Plasencia contends that the notice provided her was inadequate. She apparently had less than 11 hours' notice of the charges and the hearing. The regulations do not

require any advance notice of the charges against the alien in an exclusion hearing, and the BIA has held that it is sufficient that the alien have notice of the charges at the hearing, *In re Salazar, supra,* at 169. The United States has argued to us that Plasencia could have sought a continuance. It concedes, however, that there is no explicit statutory or regulatory authorization for a continuance.

Finally, Plasencia contends that she was allowed to waive her right to representation, § 292, 8 U. S. C. § 1362,[8] without a full understanding of the right or of the consequences of waiving it. Through an interpreter, the Immigration Law Judge informed her at the outset of the hearing, as required by the regulations, of her right to be represented. He did not tell her of the availability of free legal counsel, but at the time of the hearing, there was no administrative requirement that he do so. 8 CFR § 236.2(a) (1975). The Attorney General has since revised the regulations to require that, when qualified free legal services are available, the immigration law judge must inform the alien of their existence and ask whether representation is desired. 44 Fed. Reg. 4654 (1979) (codified at 8 CFR § 236.2(a) (1982)). As the United States concedes, the hearing would not comply with the current regulations. See Tr. of Oral Arg. 11.

If the exclusion hearing is to ensure fairness, it must provide Plasencia an opportunity to present her case effectively, though at the same time it cannot impose an undue burden on the Government. It would not, however, be appropriate for us to decide now whether the new regulation on the right to notice of free legal services is of constitutional magnitude or whether the remaining procedures provided comport with the Due Process Clause. Before this Court, the parties have devoted their attention to the entitlement to a deportation hearing rather than to the sufficiency of the procedures in the

---

[8] The statute provides a right to representation without expense to the Government. § 292, 8 U. S. C. § 1362. Plasencia has not suggested that she is entitled to free counsel.

exclusion hearing.[9]  Whether the several hours' notice gave Plasencia a realistic opportunity to prepare her case for effective presentation in the circumstances of an exclusion hearing without counsel is a question we are not now in a position to answer.  Nor has the Government explained the burdens that it might face in providing more elaborate procedures. Thus, although we recognize the gravity of Plasencia's interest, the other factors relevant to due process analysis—the risk of erroneous deprivation, the efficacy of additional procedural safeguards, and the Government's interest in providing no further procedures—have not been adequately presented to permit us to assess the sufficiency of the hearing.  We remand to the Court of Appeals to allow the parties to explore whether Plasencia was accorded due process under all of the circumstances.

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE MARSHALL, concurring in part and dissenting in part.

I agree that the Immigration and Nationality Act permitted the INS to proceed against respondent in an exclusion

---

[9] Thus, the question of Plasencia's entitlement to due process has been briefed and argued, is properly before us, and is sufficiently developed that we are prepared to decide it.  Precisely what procedures are due, on the other hand, has not been adequately developed by the briefs or argument. The dissent undertakes to decide these questions, but, to do so, must rely heavily on an argument not raised by Plasencia: to wit, that she was not informed at the hearing that the alleged agreement to receive compensation and the meaningfulness of her departure were critical issues.  Also, the dissent fails to discuss the interests that the Government may have in employing the procedures that it did.  The omission of arguments raised by the parties is quite understandable, for neither Plasencia nor the Government has yet discussed what procedures are due.  Unlike the dissent, we would allow the parties to explore their respective interests and arguments in the Court of Appeals.

proceeding. The question then remains whether the exclusion proceeding held in this case satisfied the minimum requirements of the Due Process Clause. While I agree that the Court need not decide the precise contours of the process that would be constitutionally sufficient, I would not hesitate to decide that the process accorded Plasencia was insufficient.[1]

The Court has already set out the standards to be applied in resolving the question. Therefore, rather than just remand, I would first hold that respondent was denied due process because she was not given adequate and timely notice of the charges against her and of her right to retain counsel and to present a defense.[2]

While the type of hearing required by due process depends upon a balancing of the competing interests at stake, due process requires "at a minimum . . . that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing." *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 313 (1950). See, *e. g.*, *Bell* v. *Burson*, 402 U. S. 535, 542 (1971). Permanent resident aliens who are detained upon reentry into this country clearly are entitled to adequate notice in advance of an exclusion proceeding.

---

[1] Because the due process question was squarely addressed in the briefs and at oral argument, there is no doubt that the Court may now decide the issue. See *Vance* v. *Terrazas*, 444 U. S. 252, 258–259, n. 5 (1980), and cases cited therein. In fact, the Court has reached the threshold of deciding the constitutional question. It has identified the deficiencies in the exclusion hearing afforded Plasencia, and it has set forth the standards that it would apply to determine whether the procedures, as described, denied Plasencia due process. I do not see any interest to be served in declining to take the final step of applying these due process standards to the record before us, as the Court of Appeals would otherwise be required to do on remand.

[2] Because Plasencia did not receive constitutionally sufficient notice, I find it unnecessary to address the other constitutional deficiencies she asserts.

To satisfy due process, notice must "clarify what the charges are" in a manner adequate to apprise the individual of the basis for the government's proposed action. *Wolff* v. *McDonnell*, 418 U. S. 539, 564 (1974). Notice must be provided sufficiently in advance of the hearing to "give the charged party a chance to marshal the facts in his defense." *Id.*, at 563, 564 (prisoners charged with disciplinary violations must be given "advance written notice of the claimed violation"). See, *e. g.*, *Goldberg* v. *Kelly*, 397 U. S. 254, 267–268 (1970) (welfare recipients must be given "timely and adequate notice detailing the reasons for a proposed termination"); *In re Gault*, 387 U. S. 1, 33 (1967) (juvenile must be given notice of "the specific charge or factual allegations" to be considered at delinquency hearing "at the earliest practicable time, and in any event sufficiently in advance of the hearing to permit preparation").

Respondent was not given notice sufficient to afford her a reasonable opportunity to demonstrate that she was not excludable. The Immigration Judge's decision to exclude respondent was handed down less than 24 hours after she was detained at the border on the night of June 29, 1975. By notice in English dated June 30, 1975, she was informed that a hearing would be conducted at 11 o'clock on the morning of that same day, and that the Government would seek to exclude her on the ground that she had "wilfully and knowingly aided and abetted the entry of illegal aliens into the United States in violation of the law and for gain."[3] It was not until the commencement of the hearing that she was given notice in her native language of the charges against her and of her right to retain counsel and to present evidence.

The charges against Plasencia were also inadequately explained at the hearing itself.[4] The Immigration Judge did not explain to her that she would be entitled to remain in the

---

[3] It is unclear from the record whether respondent received the notice prior to the commencement of the hearing.

[4] The exclusion hearing was conducted with the aid of an interpreter.

country if she could demonstrate that she had not agreed to receive compensation from the aliens whom she had driven across the border.[5] Nor did the judge inform respondent that the meaningfulness of her departure was an issue at the hearing.

These procedures deprived Plasencia of a fair opportunity to show that she was not excludable under the standards set forth in the Immigration and Nationality Act. Because Plasencia was not given adequate notice of the standards for exclusion or of her right to retain counsel and present a defense, she had neither time nor opportunity to prepare a response to

---

[5] The principal issue of fact at the hearing was whether Plasencia had transported the six aliens "for gain." Plasencia, who was called as the Government's first witness, denied repeatedly that any of the aliens had agreed to pay her for driving them into this country. The Government's trial attorney then called three of the six aliens as witnesses. One witness, Jose Alfredo Santillana, stated unequivocally that he was picked up by the Plasencias while hitchhiking and that, without making any mention of money, they agreed to drive him to Los Angeles. A second witness, Luis Polio-Medina, testified that there had not been any talk with Plasencia at any time about payment for transportation to Los Angeles, though there "was kind of an understanding" that "some people in Los Angeles" whom he "was going to look for" would pay her a "normal amount" on his behalf. Only the third witness, Eugenia Linares-Moreno, testified that she had an agreement to pay Plasencia for transportation into the country. Given the weakness of the Government's evidence, Plasencia may well have been prejudiced by her inability to prepare for the hearing and to obtain counsel. The three aliens who did not testify at the hearing might have supported Plasencia's claim that she did not expect to receive financial compensation. The Immigration Judge's finding that Plasencia transported the aliens for gain must have depended on his acceptance of the testimony given by Linares-Moreno and Polio-Medina. The motives of these Government witnesses in testifying against Plasencia were open to question, since they were subject to criminal prosecution in this country. The credibility of Linares-Moreno, the Government's key witness, might also have been challenged on the grounds that she had contradicted herself on at least one key question during the course of her examination and that she had concededly lied to an INS officer by giving a false name. Vigorous cross-examination by a competent attorney might well have led the Immigration Judge to resolve the disputed issue of fact in Plasencia's favor.

the Government's case. The procedures employed here virtually assured that the Government attorney would present his case without factual or legal opposition.

When a permanent resident alien's substantial interest in remaining in this country is at stake, the Due Process Clause forbids the Government to stack the deck in this fashion. Only a compelling need for truly summary action could justify this one-sided proceeding. In fact, the Government's haste in proceeding against Plasencia could be explained only by its desire to avoid the minimal administrative and financial burden of providing her adequate notice and an opportunity to prepare for the hearing. Although the various other Government interests identified by the Court may be served by the exclusion of those who fail to meet the eligibility requirements set out in the Immigration and Nationality Act, they are not served by procedures that deny a permanent resident alien a fair opportunity to demonstrate that she meets those eligibility requirements.

I would therefore hold that respondent was denied due process.