Masaki **HAMAYA**, Petitioner,

v.

Edward J. **McELROY**, Assistant District Director, Deportation, Immigration and Naturalization Service, New York District Office, Respondent.

No. CV–92–1961.

United States District Court,
E.D. New York.

July 2, 1992.

Stanley H. Wallenstein, New York City, for petitioner.

Scott Dunn, Asst. U.S. Atty., Brooklyn, N.Y., for respondent.

MEMORANDUM AND ORDER

GLASSER, District Judge:

Petitioner Masaki Hamaya, age 31, is a citizen of Japan. He has resided in the United States since 1983, and received permanent resident status here in 1987. In February 1989, Hamaya was convicted in South Carolina of possession of one tablet containing mescaline—a misdemeanor under S.C.Code Ann. § 44–53–370—and received an alternative sentence of two months' imprisonment or a $200 fine.

Hamaya departed the United States for a business trip to Japan in late April 1991, and returned on March 7, 1992. On attempting to re-enter the United States, Hamaya was detained as an alien excludable on the basis of a drug-related offense under 8 U.S.C. § 1182(a)(2)(A)(i)(II). Hamaya then obtained counsel, who made a written application for release on parole to respondent McElroy, the Assistant District Director for the Immigration and Naturalization Service (INS) charged with rendering decisions concerning discretionary release. By letter dated April 3, McElroy denied Hamaya's request on the grounds of risk of flight.

Hamaya now petitions this court for relief from the INS denial of parole. While Hamaya's petition appears at certain points to request an order compelling the INS to release him on security bond,[1] the thrust of the petition is that due process entitles him to a hearing on the issue of parole. In so arguing, Hamaya relies primarily on the argument that his resident alien status entitles him to due process protection comparable to that accorded to aliens subjected to deportation from within the United States. Because this court agrees that Hamaya is entitled to a hearing as a matter of due process, the petition is granted.

---

1. For instance, the conclusion of Hamaya's reply brief asks this court to "grant the writ directing that the INS set a reasonable bond as a safeguard against the risk that Hamaya may abscond." Reply Brief at 10.

2. The use of these terms within the relevant statutes and the pertinent case law is inconsistent. The process of declaring an alien removable from within the United States is sometimes

## I. The Statutory and Regulatory Framework

An alien admitted to the United States is subject to "deportation" under section 241 of the Immigration and Naturalization Act of 1952 ("the Act"), codified at 8 U.S.C. § 1251. By contrast, an alien—whether a returning permanent resident or a first-time arrival—who seeks admission to the United States at the border is subject to "exclusion" [2] under section 212 of the Act, 8 U.S.C. § 1182.

■ The distinction between deportation and exclusion is significant, as "[d]eportation proceedings are generally more favorable to the alien than exclusion proceedings." *Correa v. Thornburgh*, 901 F.2d 1166, 1171 n. 5 (2d Cir.1990). An alien subject to deportation, as opposed to one facing exclusion, enjoys a panoply of statutorily guaranteed rights, including the right to advance notice of the charges, the imposition of the burden of proof on the government, direct appeal of an adverse determination to the circuit court, and the right to designate the country of destination. *Id.; see also Landon v. Plasencia*, 459 U.S. 21, 25–27, 103 S.Ct. 321, 325–326, 74 L.Ed.2d 21 (1982); *Maldonado–Sandoval v. INS*, 518 F.2d 278, 280 n. 3 (9th Cir.1975).

Among the differences between deportation and exclusion proceedings is the provision for release pending resolution on the merits. Under 8 U.S.C. § 1182(d)(5)(A), an alien subject to exclusion may be provisionally admitted to the United States:

The Attorney General may ... in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public

---

referred to as "expulsion". Similarly, "deportation" is sometimes used to signify the actual physical removal of the alien—whether incident to an "expulsion" or an "exclusion" proceeding—from the confines of the United States. *See, e.g., Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n. 4, 73 S.Ct. 472, 477 n. 4, 97 L.Ed. 576 (1953).

interest any alien applying for admission. . . .

The Attorney General has delegated responsibility for making such decisions to the respective district directors, pursuant to 8 C.F.R. §§ 100.2(e) and 212.5. Section 212.5 narrowly defines the terms of the statute:

(1) The parole of aliens who have serious medical conditions in which continued detention would not be appropriate would generally be justified by "emergent reasons";

(2) The parole of aliens within the following groups would generally come within the category of aliens for whom the granting of the parole exception would be "strictly in the public interest", provided that the aliens present neither a security risk nor a risk of absconding:

(i) Women who have been medically certified as pregnant;

(ii) Aliens who are defined as juveniles . . .;

(iii) Aliens who have close family relatives in the United States (parent, spouse, children, or siblings who are United States citizens or lawful permanent resident aliens) who are eligible to file, and have filed, a visa petition on behalf of the detainee;

(iv) Aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States;

(v) Aliens whose continued detention is not in the public interest as determined by the district director.

By contrast, an alien subject to deportation is covered by 8 U.S.C. § 1252(a)(1), which provides that

such alien may, upon warrant of the Attorney General, be arrested and taken into custody. . . . [A]ny such alien . . . may, in the discretion of the Attorney General . . . (A) be continued in custody; or (B) be released under bond in the amount of not less than $500 with security approved by the Attorney General, containing such conditions as the Attor-

ney General may prescribe; or (C) be released on conditional parole.

Both the Bureau of Immigration Appeals and other district courts within this circuit have construed this section as favoring release, noting that "[a]n alien generally is not and should not be detained or required to post bond except on a finding that he is a threat to the national security . . . or that he is a poor bail risk." *In re Patel,* 15 I. & N. Dec. 666 (BIA 1976) (citations omitted) (quoted with approval in *Appah v. Sava,* 636 F.Supp. 207, 210 (S.D.N.Y.1986)).

## II. Hamaya's Claims

### A. The "Meaningful Interruption" Exception to Departure

Initially, Hamaya argues unpersuasively that this case falls within the ambit of *Rosenberg v. Fleuti,* 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963). In *Fleuti,* the Court confronted the problem of whether a return after a brief absence from the United States constitutes an "entry" within the meaning of 8 U.S.C. § 1101(a)(13), which determines whether adverse proceedings are for deportation or for exclusion. (Fleuti himself had traveled to Mexico and returned within "a couple hours".) In articulating a "meaningful interruption" rule, under which short absences—even voluntary ones—could be excused from the literal rule, the Court sought to ease the harsh result of subjecting a resident alien to possible exclusion and loss of his status merely because of the physical act of traversing the border.

*Fleuti* is simply irrelevant to the case at hand, since it involves a threshold question of whether an alien is constructively "within" the United States (and therefore subject only to deportation, with all the attendant protections) or whether the alien has been detained at "entry" (and is therefore open to exclusion). Since there can be no dispute that Hamaya's ten-month absence constitutes a "meaningful interruption" well outside the narrow judicial exception crafted in that case,[3] *Fleuti* offers no guidance here.

---

3. *But see Jubilado v. United States,* 819 F.2d 210 (9th Cir.1987) (return after 3–month absence

## B. Entitlement to Procedural Due Process

■ Hamaya asserts that as a resident alien briefly absent from the United States, his status must be "assimilated" to that of a resident alien subjected to deportation proceedings. Hamaya argues that he enjoys essentially the same due process protections as a resident alien within the U.S., and that he is therefore entitled to a hearing on his request for parole. While this court is not altogether persuaded by Hamaya's interpretation of the cases comparing the relative status of resident aliens within and without the U.S., it is indisputable that resident aliens seeking readmission are in most cases entitled to due process.

Hamaya relies on a pair of Supreme Court decisions, *Kwong Hai Chew v. Colding*, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953) and *Landon v. Plasencia*, 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982), in which the Court set out general due process considerations applicable to returning resident aliens. In *Kwong Hai Chew*, the Court considered the predicament of a resident alien summarily excluded from the country. Kwong first arrived in the U.S. in 1945, and was made a permanent resident (retroactive to 1945) in 1949. After obtaining Coast Guard clearance for service in the merchant marine, Kwong signed on as chief steward with an American vessel based in New York City. Upon completing his four-month tour, which included calls at various ports in the Far East, Kwong returned to the U.S. in March 1951. He was immediately detained at the border, and ordered excluded without notice or a hearing.

On consideration of Kwong's habeas corpus petition, the Court announced that "[f]or purposes of his constitutional right to due process, we assimilate petitioner's status to that of an alien continuously residing and physically present in the United States." 344 U.S. at 596, 73 S.Ct. at 477 (footnote omitted). The Court went on to find that Kwong's due process rights had been substantially infringed, and ordered

an exclusion hearing to be held on sufficient notice.

In *Plasencia*, the Court considered the case of a resident alien who departed the country for two days and was detained upon return while attempting to assist the illegal entry of other aliens. After a hearing on 11 hours' notice, Plasencia was ordered excluded. Both the district court and the Ninth Circuit, on consideration of Plasencia's habeas corpus petition, concluded that she was entitled to litigate the threshold question of whether her departure and return constituted an "entry" under *Fleuti* in deportation proceedings, rather than in the more limited exclusion proceedings to which she had been subjected.

On appeal, the Court held that Plasencia was not entitled to litigate her status in deportation proceedings, and that the INS had acted properly in proceeding by way of exclusion. 459 U.S. at 31–32, 103 S.Ct. at 328–329. More importantly, the Court then proceeded to a discussion of Plasencia's entitlement to due process, noting at the outset that *Kwong Hai Chew* established clearly that a resident alien returning from a brief trip has a right to due process as does a continuously present resident alien. *See id.* at 31, 33, 103 S.Ct. at 328, 329. The Court declined to reach the issue of precisely what process was due Plasencia under the circumstances, and remanded the case to the lower court for consideration of that question.

*Plasencia* is central to the determination of the present case in two respects. First, the Court's decision disposes of Hamaya's claim that the government has infringed his right to equal protection by placing him into exclusion proceedings rather than deportation proceedings. As the Court made explicit, continuously present and returning resident aliens are "differently situated groups," *id.* at 31, 103 S.Ct. at 328; the fact that members of these groups have the same due process rights "does not create a right to identical treatment".[4] *Id.*

was not "entry" under the statute).

**4.** While obliged to abide by this settled precedent, this court finds the implications of *Plasen-*

*cia* troubling. Had INS sought to expel Hamaya before his voluntary departure from the country—a circumstance which could have arisen at

In its papers, the government repeatedly cites *Correa v. Thornburgh,* 901 F.2d 1166, 1174 (2d Cir.1990), for the allegedly dispositive proposition "that a resident alien who leaves this country and attempts to enter the United States on his or her return, is subject to *all* current exclusionary laws" (emphasis in original). What is absent from the government's argument is the recognition that although Congress enjoys enormous power in framing statutes (and in authorizing regulations) concerning aliens, those statutes and regulations cannot be enforced in a manner inconsistent with the requirements of due process.[5] Thus, while Hamaya may be subject to the laws governing exclusion rather than those for deportation, that fact standing alone does not conclude this court's inquiry.

■ Again, *Plasencia* provides an answer. The Court's opinion strongly suggests that Hamaya enjoys a right to due process, and that while he may be subjected to exclusion proceedings, those proceedings must be measured against constitutional standards. While the Court articulated a limited exception under which resident aliens may be deemed to have abandoned their ties to the U.S. (and therefore their entitlement to due process), Hamaya does not come within that narrow exception.

Specifically, the *Plasencia* Court stated that "[i]f the permanent resident alien's absence is extended ... he may lose his entitlement to "assimilat[ion of his] status"

... to that of an alien continuously residing and physically present in the United States. *Id.* 459 U.S. at 31, 33, 103 S.Ct. at 328, 329 (citing *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953)). In *Mezei,* the Court held that a resident alien returning from Communist-controlled Eastern Europe after a 20–month absence had no entitlement to due process, and could properly be excluded without a hearing or explanation. 345 U.S. at 214–15, 73 S.Ct. at 630–31.

Several considerations lead to the conclusion that Hamaya is not within the exception articulated in *Mezei.* Most important, of course, is the simple fact that Hamaya's absence lasted only half as long as Mezei's 20 months abroad. In addition, a reading of the cases citing *Mezei* shows it to be *sui generis:* as far as this court is able to discern, the "loss of entitlement" rule has never since been applied to deprive a returning resident of due process protections. Under the circumstances, this court is loath to regard this case as substantially different from *Kwong Hai Chew,* especially given the absence in the record of any significant evidence that Hamaya's departure was a wilful abandonment of his status.[6]

As Judge Learned Hand once wrote in a related context, "It is well that we should be free to rid ourselves of those who abuse our hospitality; but it is more important that the continued enjoyment of that hospi-

---

any time after his February 1989 South Carolina misdemeanor conviction, as provided for in 8 U.S.C. § 1251(a)(2)(B)(i)—he would have been afforded the many additional protections that accompany deportation proceedings. The *only* basis for distinguishing between that hypothetical case and this one is that Hamaya chose to exercise his right to travel. *This court regards the disparate treatment of these ostensibly "differently situated groups" as an unacceptable infringement on resident aliens' right to travel* and would, in the absence of binding precedent, reach a different conclusion.

**5.** As Justice Marshall observed in his dissent in *Jean v. Nelson,*

"[g]ranting that the requirements of due process must vary with the circumstances," the Court is obliged to determine whether decisions concerning the parole of unadmitted aliens are consistent with due process, and

it cannot "pass the buck to an assertedly all-powerful and unimpeachable Congress." Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv.L.Rev. 1362, 1394 (1953)....

472 U.S. 846, 876, 105 S.Ct. 2992, 3008, 86 L.Ed.2d 664 (1985) (Marshall, J., dissenting).

**6.** The government notes that one of the substantive charges brought against Hamaya is that he has abandoned his residence. Dunn Affid. ¶ 9. No support for that charge has been made to appear here by affidavit or otherwise. Indeed, *according to the unsworn submission of petitioner's counsel,* that claim has been summarily rejected by the immigration judge presiding over the exclusion proceedings. Wallenstein Ltr. (June 3, 1992) at 5.

tality once granted, shall not be subject to meaningless and irrational hazards." *Di Pasquale v. Karnuth,* 158 F.2d 878, 879 (2d Cir.1947). Accordingly, Hamaya is entitled to due process in the proceedings against him, including but not limited to the determination as to his eligibility for parole.

## B. The Specific Requirements of Procedural Due Process

In light of the foregoing, this court must determine the scope of the due process to which Hamaya is entitled. As the Supreme Court noted in *Plasencia,*

[t]he constitutional sufficiency of procedures provided in any situation, of course, varies with the circumstances.... In evaluating the procedures in any case, the courts must consider the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures rather than additional or different ones.

459 U.S. at 34, 103 S.Ct. at 330 (citing *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976)). Upon analyzing the present case within this framework, the court concludes that Hamaya's due process rights have been violated.

### 1. The interests at stake for the detained alien

■ When a resident alien faces exclusion, the interest at stake "is, without question, a weighty one." *Plasencia,* 459 U.S. at 34, 103 S.Ct. at 330. The significant right " 'to stay and live and work in this land of freedom' " is thereby placed in jeopardy. *Id.* (quoting *Bridges v. Wixon,* 326 U.S. 135, 154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103 (1945)). In addition, many aliens face the prospect of separation from their family members, a deprivation which the Supreme Court has repeatedly "rank[ed] high among the interests of the individual." *Plasencia,* 459 U.S. at 34, 103 S.Ct. at 330 (citing cases).

The government asserts that the burden imposed on Hamaya in this case is of his own choosing, in that Hamaya is free to depart the United States for any country (including that of his birth) willing to receive him. The court rejects this argument in its entirety. The liberty interest at issue in this case is not merely whether Hamaya is to remain in INS custody; it is whether Hamaya is to be deprived of the freedom to reside, work, and travel *within the United States,* rights which Hamaya was formerly granted when he became a resident alien. It is beside the point to say that Hamaya enjoys unspecified rights in other parts of the world, when those are not the rights sought to be vindicated. As Justice Jackson once observed, "[i]t overworks legal fiction to say that one is free in law when by the commonest of common sense he is bound.... We must regard this alien as deprived of liberty, and the question is whether the deprivation is a denial of due process of law." *Mezei,* 345 U.S. at 220–21, 73 S.Ct. at 633–34 (Jackson, J., dissenting).

### 2. The relative merits and risks of different procedures

■ The court also regards as substantial the risks associated with the denial of a full hearing. In the first instance, in-person testimony by, and on behalf of, the detainee promises to make the Director better informed both as to the detainee's character and as to the reliability of those willing to vouch for him. Moreover, unlike a written application process, a hearing offers the Director an opportunity to question the detainee directly, as well as providing a forum in which the Director's concerns may be aired and addressed immediately by the detainee or his counsel. As the Supreme Court has stated,

Written submissions are an unrealistic option for most [applicants], who lack the educational attainment necessary to write effectively and who cannot obtain professional assistance. Moreover, written submissions do not afford the flexibility of oral presentations; they do not permit the [applicant] to mold his argument to the issues the decision maker

appears to regard as important. Particularly where credibility and veracity are at issue ... written submissions are a wholly unsatisfactory basis for decision.

*Goldberg v. Kelly,* 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970). Given that the Court reached this conclusion in reference to the pre-deprivation process necessary for termination of public assistance payments, it follows *a fortiori* that due process requires a full *post*-deprivation hearing where the most fundamental of due process interests—personal liberty itself—is at stake.

The risks associated with denying a parole hearing to an alien subject to exclusion become more evident upon consideration of the structure of the parole determination process. In deportation proceedings, the applicant may appeal the original determination to an immigration judge; in turn, appeal from that judge's decision lies to the Board of Immigration Appeals. 8 C.F.R. § 242.2(d). In the exclusion context, on the other hand, there is no provision for additional administrative proceedings beyond the initial determination. Thus, applicants in Hamaya's situation have only a single opportunity to make their case for release. This court believes that they should be permitted to use that opportunity in the meaningful manner that only an evidentiary hearing allows.

Moreover, the fact that the INS Director enjoys broad discretion in making his determination does not diminish the importance of the factors to be considered under the *Mathews* test. *Cf. Leader v. Blackman,* 744 F.Supp. 500, 508 (S.D.N.Y.1990) (resident alien convicted of aggravated felony, and therefore subject to deportation, has right to bail hearing "even though an Immigration Judge retains the right to deny bail to an applicant"). On the contrary, it is precisely because the Director enjoys such discretion that Hamaya should be afforded a full hearing. Were it otherwise, it

is almost inconceivable that any applicant could overcome the presumption of regularity that attaches to such decisions.

The record in this case fully illustrates the problems of cursory review associated with denying a hearing. While this court is not called upon here to review respondent's decision on the merits,[7] it cannot but imagine that a hearing in this case would benefit both respondent in the exercise of his discretion and the district court upon any subsequent review. As the first of the two grounds for denial, respondent's April 3 letter observes that Hamaya has a criminal record, yet it provides no factual basis for inferring therefrom that Hamaya is a risk of flight. Hamaya's only apparent conviction is not for prison escape, illegal entry into the country, or obstruction of justice—offenses which might support such an inference—but for the misdemeanor offense of possessing a *single* tablet containing mescaline, the penalty for which has been fully meted out. Nor is it anywhere indicated that Hamaya improperly failed to appear for sentencing or to report to jail in connection with that conviction. Moreover, respondent made no finding as to abandonment of residence, lack of employment, lack of close family in the United States, or any of the usual factors that enter into a "risk of flight" determination. *See, e.g., Micovic v. McElroy,* 790 F.Supp. 75 (S.D.N.Y.1992) (denial of parole upheld where alien attempted entry using fraudulent immigration documents).

Respondent's primary basis for the denial of parole brings into even sharper relief the need for fuller elaboration of the relevant facts in this case. The April 3 letter makes the astonishing claim that "it would be difficult to conclude that [Hamaya] is not a risk to abscond were he to be released, especially considering that he ... appears to be excludable under Section 212(a)(2)(A)(i)(II) of the INA [*i.e.,* 8 U.S.C. § 1182(a)(2)(A)(i)(II) ]." Under 8 C.F.R.

---

7. Petitioner has not fully raised the question of whether respondent's decision constitutes an abuse of discretion. As an aside, however, this court emphatically rejects the government's suggestion "that the District Director's parole determination is absolute." Gov't Supp. Brief (May

21, 1992) at 2. As the Second Circuit has made clear in *Bertrand v. Sava,* 684 F.2d 204, 210–13 (2d Cir.1982)—a case cited in the government's own papers—district courts most assuredly possess the power to review parole determinations.

§ 212.5(a), which provides a framework for applying section 212(d)(5)(A) of the Act, "a risk of absconding" is a factor which conclusively bars the grant of parole. To regard the fact of apparent excludability—a fact necessarily common to *every* detained alien seeking parole under section 212—as a reason for denying release is to turn logic on its head. It would deprive the regulation of all meaning, creating an administrative Catch–22 in which no release could ever qualify as "strictly in the public interest." [8] As above, requiring a hearing will have the beneficial result of focusing the attention of the INS hearing officer on the *particular facts* presented in the individual case, rather than on conclusory and circular legalisms of the type applied in this case to deny Hamaya's request.

It is well worth noting that Hamaya does not argue, nor does this court hold, that due process requires a hearing prior to detention by the INS. As the Second Circuit recently noted, "an important governmental interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted[,] may justify postponing the opportunity to be heard until after the initial deprivation." *Strong v. Board of Educ.*, 902 F.2d 208, 212 (2d Cir.) (citing *Federal Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 239, 108 S.Ct. 1780, 1787, 100 L.Ed.2d 265 (1988)), *cert. denied,* ── U.S. ──, 111 S.Ct. 250, 112 L.Ed.2d 208 (1990). The court assumes (without deciding) that given the enormous governmental interest in immigration matters, and the broad powers accorded Congress in that regard, *see, e.g., Correa,* 901 F.2d at 1173 (citing numerous cases), that resident aliens seeking re-admission may be detained initially without a hearing.

Under those circumstances, however, the need for a full post-deprivation hearing is doubly pressing, particularly where a core liberty interest is at stake. In *Mathews,* the Supreme Court's decision—that due process does not require a full evidentiary hearing prior to termination of Social Security disability benefits—turned in part on the availability of full retroactive benefits to a prevailing recipient. 424 U.S. at 340–41, 96 S.Ct. at 905–06. Here, by contrast, Hamaya can *never* recoup his days in administrative detention even if his efforts to resist exclusion ultimately bear fruit.

3. The governmental interest in using current procedures

Finally, while the government undoubtedly has an interest in proceeding by way of written submission and decision, that interest does not rise to a level sufficient to overcome a detainee's interest in a full hearing. As one court noted recently in ordering the INS to grant such a hearing to an alien in deportation proceedings, "[a] bail hearing would not pose significant fiscal or administrative burdens on the government and would greatly minimize the risk of erroneous deprivation of a liberty interest." *Leader,* 744 F.Supp. at 508. That conclusion is bolstered by recognition of the fact that relatively few of the many aliens detained at the U.S. border are resident aliens entitled to full due process protection.

III.

In order to avoid confusion, the court emphasizes that its decision does not bes-

---

**8.** This court is aware that at least one Circuit has adopted the erroneous rationale applied by respondent. *See Mason v. Brooks,* 862 F.2d 190, 195 (9th Cir.1988). As a careful reading of *Mason* makes manifest, that case relies upon a misreading of the decision in *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). The Ninth Circuit concluded that Mason was properly denied parole on the ground that his potential excludability (for a controlled substance conviction) constituted "a facially legitimate and bona fide reason" for the denial. 862 F.2d at 195 (citing *Kleindienst,* 408 U.S. at 770, 92 S.Ct. at 2585). In *Kleindienst,* however, the basis for exclusion upheld by the Court was not the mere fact that Mandel came within one of the many exclusion provisions (former sections 212(a)(28)(D), (G)(v) of the Act, now repealed), but rather that Mandel had violated the terms of his prior visas. 408 U.S. at 769, 92 S.Ct. at 2585 ("[T]he official empowered to make the decision stated that ... previous abuses by Mandel made it inappropriate to grant a waiver again."). Thus, while *Kleindienst* sets out the proper standard of review in parole denial cases, it does not endorse the questionable position that apparent excludability itself constitutes "a facially legitimate and bona fide reason" capable of surviving review.

tow the right to a full parole hearing on every alien seeking admission to the United States. As the foregoing discussion of *Kwong Hai Chew* and *Plasencia* makes clear, today the court decides only that under the circumstances, Hamaya's status as a returning resident alien entitles him to a full hearing on the issue of parole into the country.

Accordingly, the petition is granted. Respondent is directed to conduct a hearing for consideration of parole within ten calendar days of the entry of this order, or to release Hamaya under conditions consistent with section 212(d)(5)(A) of the Act.

SO ORDERED.