**Celso Lopez LOPEZ, Plaintiff,**

v.

**M. ARAN, J. Figueroa, I. Moreno, individually and as agents of the U.S. Immigration and Naturalization Services; Allen C. Nelson, in his official capacity as the Commissioner of the U.S. Immigration and Naturalization Services; James H. Walker, in his official capacity as District Director of the U.S. Immigration and Naturalization Services for the District of Puerto Rico; Doe, John; Wackenhut Services, Inc. and Eastern Airlines, Defendants.**

**Civ. No. 83–2388 (JP).**

United States District Court, D. Puerto Rico.

July 11, 1986.

José A. Lugo, Instituto Puertorriqueño de Derechos Civiles, Río Piedras, P.R., William Santiago Sastre, San Juan, P.R., for plaintiff.

Eduardo Toro Font, U.S. Atty.'s Office, Hato Rey, P.R., for Federal Defendants.

Francisco Ponsa Flores, San Juan, P.R., for Eastern Airlines.

Iván M. Fernández, Hato Rey, P.R., for Wackenhut.

## OPINION AND ORDER

PIERAS, District Judge.

The Court has before it the claims of plaintiff Celso López López brought pursuant to the Fourth and Fifth Amendments of the United States Constitution for declaratory judgment and permanent injunctive relief against Immigration and Naturalization Service (INS) Commissioner Allen Nelson, INS District Director James Walker, and INS agents M. Aran, J. Figueroa and I. Moreno in their official capacities. Plaintiff is requesting the Court to declare 8 U.S.C. § 1182(d)(7) and 8 C.F.R. § 235.5 unconstitutionally vague on their face and unconstitutional as applied to plaintiff under the constitutional guarantee of equal protection under the law. In addition, plaintiff claims 8 C.F.R. § 235.5 was promulgated *ultra vires* in violation of the Fifth Amendment "with the intent of arbitrarily and indiscriminately examining United States citizens".[1] Plaintiff is also requesting permanent injunctive relief ordering the INS to desist its airport checkpoint practice on flights from Puerto Rico to the United States mainland on the basis that the actions of the named immigration agents violate the plaintiff's Fourth and Fifth Amendment rights by subjecting him to unreasonable search and seizure, to deprivation of his liberty without due process of law, and to infringement of his "right to travel freely."[2]

The Complaint in this case pleads four incidents, two of which allegedly occurred in 1979 and 1980. The 1979 and 1980 incidents are without specific date or place and have been denied by defendant for lack of knowledge. Given the lack of specificity provided by plaintiff and the specificity required to allow defendant adequate notice and opportunity to defend its case, the Court finds that these two incidents fail to meet the liberal standards of notice pleading and we, therefore, DISMISS plaintiff's Complaint as to these particular pleadings (Paragraphs 10–20).

By Opinion and Order dated October 31, 1984, this Court granted partial summary judgment in favor of defendants Moreno, Arán and Figueroa with respect to plaintiff's claims against them in their individual capacities for civil damages. That Opinion and Order left open plaintiff's claims for injunctive and declaratory relief, and the grounds for these claims were expanded in plaintiff's Amended Complaint filed February 26, 1985. Subsequently, the parties submitted the case for decision on the briefs and stipulated evidence. We reach the following findings of fact and conclusions of law based on our prior Opinion and Order and on the evidence designated by the parties' joint motion filed April 30, 1985 and the arguments of the parties submitted

1. Plaintiff's Amended Complaint, par. 52. Although the basis of this charge is not altogether clear, we assume plaintiff is referring in his Amended Complaint to an action in violation of the Equal Protection component of the Due Process clause of the Fifth Amendment.

2. Plaintiff's Amended Complaint, par. 54. Plaintiff makes no distinction between right to interstate travel and right to international travel. We decide the issue *supra* construing the pleadings liberally.

January 15, 1985, February 21, 1985, and May 17, 1985.

## I. FINDINGS OF FACT [3]

1. Defendant Ivette Moreno was stationed and working as an agent of the United States INS at the Isla Verde International Airport in Puerto Rico on or about July 16, 1982. Defendants María del Mar Arán and Juan E. Figueroa were both stationed and working as agents of the INS at the Isla Verde International Airport on or about October 2, 1982.

2. Plaintiff Celso López López is a United States citizen and a resident of the Commonwealth of Puerto Rico. He is also an attorney with experience in immigration law.

3. Plaintiff filed this Complaint on September 30, 1983.

4. On or about July 16, 1982, after 4:00 p.m., plaintiff approached Gate No. 7 at Isla Verde International Airport to board a Capitol Airlines flight bound for New York City. Defendant Moreno was conducting pre-boarding immigration inspection of passengers enroute to New York.

As part of the inspection, defendant Moreno took plaintiff's flight ticket and questioned him about his citizenship. Plaintiff did not answer and instead presented a card to defendant which read "Do you suspect that I am an alien?". Defendant Moreno then proceeded to conduct inspection of other passengers in line. Plaintiff then asked defendant whether she would let him go through. Agent Moreno responded affirmatively, explaining that she knew from his accent that he was Puerto Rican. Plaintiff then verbally challenged defendant Moreno's authority to question him regarding his citizenship before walking away to board his flight.

5. On or about October 2, 1982, plaintiff approached Gate No. 3 at Isla Verde International Airport in order to board an Eastern Airlines flight bound for Baltimore-Washington International Airport. Defendants Arán and Figueroa were conducting preflight immigration inspection near the Eastern departure gate.

As plaintiff passed the agents, defendant Figueroa asked plaintiff his country of citizenship. Plaintiff did not reply, but looked and smiled at the agents as he proceeded past them to place his luggage on the conveyor belt at the security inspection point. The defendants followed plaintiff to the security checkpoint and agent Figueroa repeated the question. Plaintiff then presented the prepared card which read "Do you suspect that I am an alien?". Defendant Arán then made a statement which evidenced her knowledge of the July 16, 1982 incident with defendant Moreno.

As agent Arán proceeded to conduct preflight inspection of other passengers, agent Figueroa continued the attempt to inspect plaintiff. Plaintiff's luggage had not been allowed to go through the security X-ray machine. After Arán rejoined Figueroa, plaintiff attempted to pass through the departure gate but was impeded by a security guard. Plaintiff then sought out an Eastern Airlines Supervisor, after which he retrieved his luggage and left the departure area without boarding the plane.

6. The 1982 immigration inspection checkpoint for the Capitol Airlines flight at issue was in front of the security inspection point. No other details on the appearance or manner of operation of this checkpoint are in the record.

As of April 30, 1985, the INS checkpoint for Eastern Airlines was located immediately after the metal detection security area and the Department of Agriculture inspection area. This checkpoint consists of a podium clearly marked at eye-level with bold white letters on a black background announcing "U S IMMIGRATION", and bearing on its front side a large, visible, official color seal of the United States of America. The immigration inspector at this checkpoint conducts in-

---

3. The first eight findings of fact are reproduced here from our Opinion and Order of October 31, 1984 with several additions.

spection either from behind the podium or standing a few feet in front and slightly to the side of the podium. Prior to approximately October 1984, the INS checkpoint was at the entrance to the boarding area and lacked any podium at all.[4]

7. The INS women officers involved in the checkpoints at issue wear blue uniforms with official-looking badges on the vest front; their white shirts bear an embroidered official emblem on the sleeve. The INS men officers wear blue pants and white shirts, with an official-looking badge on the shirt front pocket.

8. The officers carry out the inspection by asking passengers their country of citizenship. When the answer is affirmative as to U.S. citizenship and arouses no further suspicion to the officer, no further question is asked. If the agent suspects that the passenger is an alien in violation of the immigration laws or, if the agent cannot make a determination as to the legality of immigration status, the suspected passenger is referred to secondary inspection, a procedure which involves another officer taking the passenger to another section of the airport for questioning.

The operating rules given to the agents include instructions to examine every passenger who appears of age (18 years or older) and to remain at their posts under all circumstances. However, in the actual implementation of this rule not every passenger is examined and posts do not remain staffed at all times. At times, the INS agent arrives at the checkpoint when passengers have already passed by and are waiting in the lounge; attempts are made to question all of these individuals. In addition, on occasion the checkpoint is staffed by only one rather than two officers and, when the lone officer calls the supervisor for a replacement to be had during a bathroom break, no replacement is available.

The agents also receive instructions to take the tickets of passengers while questioning them. In general, people give their tickets voluntarily under the mistaken impression that the INS agent is an airport or airlines officer directing them how to proceed.

9. As of April 30, 1985, the Eastern flights leaving through Gates 1–6 of the Eastern Airlines boarding area covered by the INS checkpoint at issue were bound directly for the continental United States, as well as for St. Croix in the U.S. Virgin Islands, and St. Maarteen of the Netherlands Antilles. One flight stopped in the Dominican Republic before arriving at Miami. These gates are also used by Crown Air for 24 daily flights to the British and French West Indies.[5]

10. The island of Puerto Rico is situated in the Caribbean region. On the west is the island of Hispaniola, consisting of the Dominican Republic and Haiti, and on the

---

4. The parties also have submitted evidence relating to the INS checkpoints at the entrance to the boarding areas of Arrow Air and American/Delta Airlines. The Court takes judicial notice that, at the time of this Opinion, Arrow Air is no longer operating flights from the San Juan Isla Verde Airport to the U.S. mainland, or to other points within the jurisdiction of the U.S. It appears that, as of April 30, 1985, the INS checkpoint at the Arrow Air boarding area was located in front of the security and agriculture inspection areas. This checkpoint consisted of a white podium without any sign or identifying marks on it. In addition, as of April 30, 1985, the INS checkpoint at the American/Delta airlines boarding area to gates 9–16 consisted of a white podium marked with the words "U S IMMIGRATION" in the same manner as the podium used at the Eastern boarding area. The record does not reveal whether the front of the podium bore an official seal or whether the podium was located in front of or behind the security inspection area.

5. The parties have also submitted evidence as to Arrow, Capitol, American and Delta flights. As of April 30, 1985, the flights leaving Gates 7 and 8 of the Arrow Air boarding area covered by an INS checkpoint were bound directly for New York City and Miami, Florida. Gate 7 was also used by Capitol Airlines for flights to the Dominican Republic, Miami, and New York. As of April 30, 1985, the flights leaving through Gates 9–16 of the American/Delta Airlines boarding area were bound directly for cities in the continental United States. Other flights using this boarding area as of that time consisted of Lacsa flights to Costa Rica and Panama and Air France charter flights to France.

south east are the Lesser Antilles, including the U.S. Virgin Islands, the British, Dutch, and French West Indies, and Trinidad and Tobago. Many aliens, especially from the Dominican Republic, reach the Puerto Rico's shores by yawl. If they are not apprehended at that point, they then may attempt to reach the U.S. mainland through the Isla Verde airport. Other Caribbean aliens arrive in Puerto Rico on short-term visas for the purposes of shopping, visiting, or marketing goods; some of these aliens also attempt to reach the U.S. mainland via the Isla Verde airport.

11. The INS uses the airport checkpoints at issue to apprehend aliens who are either excludable or deportable from the United States.[6] The record of passengers inspected and those found in violation for Fiscal Years 1982–1985 is as follows:

| Fiscal Year | No. of Passengers Inspected | No. of passengers referred for Secondary Inspection | No. of passengers found in Violation [7] |
|---|---|---|---|
| 1982 | 1,780,024 | 4,513 | 1,710 |
| 1983 | 1,772,100 | 2,161 | 1,030 |
| 1984 | 1,834,227 | 1,674 | 674 |
| 1985 [8] | 513,041 | 286 | 166 |

12. The pre-inspection of passengers at the Isla Verde Airport plays a significant, although not paramount, role in the apprehension of illegal aliens in Puerto Rico. The statistics from 1984 and the first four months of 1985 reflecting the comparison between airport apprehensions and other types of INS enforcement activity are found in Appendix I of this Opinion.

In addition, statistics submitted by the Antismuggling Unit of the INS reveal that, of 10 smugglers of aliens apprehended and convicted during Fiscal Year 1985, five were apprehended at the airport.[9]

## II. CONCLUSIONS OF LAW

### A. *Threshold Issues: Sovereign Immunity and Justiciability*

As agreed by the parties in conference with the Court on March 26, 1985, the Opinion and Order issued on October 31, 1984 and the Partial Summary Judgment entered on November 7, 1984 stand as full adjudication by this Court of the claims by plaintiff for civil damages against co-de-

---

6. The record contains a breakdown by category of the number of aliens found in violation of the immigration laws. The categories include non-immigrants who overstayed their permits to stay or were found out of status, those who falsely claimed to be lawful permanent residents, those who entered Puerto Rico without passing through immigration inspection, those against whom deportation proceedings were pending already, alien crewmembers who have left their vessels without INS-authorized shore leave, those nonimmigrants with "Puerto Rico Only" or "U.S. Virgin Islands Only" marked on their visas and arrival-departure documents ("I-94's"), and aliens or nonimmigrants without the documentary verification of their status. This last group lacking proper documents are allowed to proceed after further questioning and/or record checks.

7. The numbers of passengers actually found in violation of the law are less than appear in this category since a significant portion of each year's numbers consist of aliens who lack proper documentary verification of their legal status and are allowed to proceed eventually after further questioning or record checks. *See* note 7, *supra.*

8. The numbers for Fiscal Year 1985 represent partial results only and were submitted by affidavit of Robert J. Bowles dated April 16, 1985.

9. The statistics submitted do not explain whether these five smugglers were apprehended by the INS checkpoint agents on duty. The Affidavit of Luis F. Monge states merely that "[s]mugglers ... have been apprehended reaching the gate through vandalized doors located past the checkpoints. Since many smugglers are paid by relatives of the smugglees in the United States upon their arrival at their final destination, it is important to avoid preinspection where the smugglees' fraudulent travel documents would be checked and possibly detected."

fendants Moreno, Arán and Figueroa, and the disposition of this case in its entirety is limited now to plaintiff's action for declaratory and injunctive relief. Thus, to the extent that defendants' arguments regarding lack of jurisdiction depend on their understanding of this case as one for damages against officials in their official capacity, defendants' arguments are without relevance and will not be addressed by this Court.

■ Defendants claim that the Court lacks subject matter jurisdiction to entertain an action for declaratory judgment and injunctive relief against the named Federal defendants in their official capacities. We disagree. Plaintiff's Amended Complaint incorporated plaintiff's original claims for review of allegedly unauthorized and unconstitutional agency action and added the claims that the statute at issue here, 8 U.S.C. § 1182(d)(7), and the regulation promulgated thereunder, 8 C.F.R. § 235.5, are unconstitutional on their face and as applied. An action against a Federal agency or officer seeking review of allegedly unauthorized or unconstitutional agency action or power to act is deemed to arise under the Constitution, laws, or treaties of the United States for purposes of jurisdiction under 28 U.S.C. § 1331, unless some other statute is interpreted as precluding such review. *Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977); 4 K. Davis, Administrative Law Treatise § 23:3 (2d ed. 1983). Sovereign immunity presents no bar to such actions. *See generally* 14 C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure* § 3655 (2d ed. 1985).

Defendants have raised no dispute regarding plaintiff's standing to bring any of these claims, and we find no cause to do so. Plaintiff has shown sufficient injury in fact to satisfy the standing requirement through his allegations of personal incidents with the defendants, the high proba-

bility of similar future actions, and the redressability of his alleged injury by any favorable decision of this Court.[10]  *See, e.g., Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

B.  *Plaintiff's Facial Challenge to the Statute*

Plaintiff's facial challenge to the constitutionality of 8 U.S.C. § 1182(d)(7) rests on the assertion that the provision is unconstitutionally vague and violative of the Fifth and Fourteenth Amendment due process guarantees because it fails to give notice of who can be legally subjected to examination and detention in Puerto Rican airports.

Section 1182(d)(7) reads as follows:

The provisions of subsection (a) of this section, except paragraphs (20), (21), and (26) of said subsection, shall be applicable to any alien who shall leave Guam, Puerto Rico, or the Virgin Islands of the United States, and who seeks to enter the continental United States. The Attorney General shall by regulations provide a method and procedure for the temporary admission to the United States of the aliens described in this proviso. Any alien described in this paragraph, who is excluded from admission to the United States, shall be immediately deported in the manner provided by section 1227(a) of this title.

8 U.S.C. § 1182(d)(7) (1970).

The exception of paragraphs (20), (21), and (26) from this section operate to exempt certain aliens without proper documentary verification from exclusion at this secondary border. Paragraph (20), 8 U.S.C. § 1182(a)(20), provides for the exclusion of aliens who, at the time of application for admission into the United States, are not in possession of valid and unexpired immigrant visas (alien registration cards—"I–151's"), reentry permits ("I–551's"), bor-

---

**10.** Under the zone of interests test, we believe plaintiff to be within the class of persons intended to be protected by the constitutional guarantees he alleges were violated, as later discussed, and by 28 U.S.C. § 1331. The need for applica-

tion of this test is presently unclear. *See U.S. v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1974). *Cf. Rental Housing Ass'n of Greater Lynn v. Hill*, 548 F.2d 388 (1st Cir.1977).

der crossing identification cards (blanket waivers), any other required entry document and, if required, valid unexpired passport or suitable substitutes. Paragraph (21), 8 U.S.C. § 1182(a)(21), provides for exclusion of aliens whose visas were issued in non-compliance with the numerical quotas established for the various categories of preference under the Immigration and Nationality Act ("the Act"), 8 U.S.C. § 1153. Paragraph (26), 8 U.S.C. § 1182(a)(26), excludes nonimmigrants who are not in possession of (1) a passport to be effective for a period of future time specified in the Act and, (2) at the time of application for admission, a valid nonimmigrant visa or border crossing identification card.

■ We begin by addressing plaintiff's argument that 8 U.S.C. § 1182(d)(7) is void for vagueness. The void-for-vagueness doctrine applied to Federal statutes arises under the due process clause of the Fifth Amendment.[11] Its purpose is to provide actual notice to citizens of what is legally proscribed and to prevent arbitrary and discriminatory enforcement by establishing minimal guidelines to govern law enforcement. *See, e.g., Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 902 (1983); *Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

Our duty is to construe the Federal statute in a manner consistent with the Constitution, if possible, *Ashwander v. Tenn. Valley Authority,* 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1935), always mindful that no act of Congress can authorize a violation of the Constitution. *Almeida-Sanchez v. U.S.,* 413 U.S. 266, 273, 93 S.Ct. 2535, 2539–40, 37 L.Ed.2d 596 (1973). Thus, a strong presumption of constitutionality operates in favor of the statute. *Mathews v. DeCastro,* 429 U.S. 181, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976).

Reading the challenged section *in pari materia* with the rest of Section 1182 and Chapter 12 of the Act, we find that the section is not void for vagueness. The statute in effect establishes a secondary border for purposes of exclusion of certain defined classes of aliens leaving Puerto Rico, Guam or the U.S. Virgin Islands and seeking to enter the continental United States or any other place under the jurisdiction of the United States. The power of the immigration authorities to inspect all persons, whether citizens or aliens, seeking to enter the United States is clear. *See generally,* 1A C. Gordon & H. Rosenfield, Immigration Law and Procedure, §§ 3.14—3.16 (1985). Indeed, Section 1225 grants the immigration service authority to require "[a]ny *person* coming into the United States ... to state under oath" (emphasis supplied) certain matters pertinent to enforcing section 1182.

Because plaintiff has raised the question, we note the consistency of section 1182(d)(7) with the Act's definitions of "entry" and "United States". "Entry" is defined as "any coming of an alien into the United States". 8 U.S.C. § 1101(a)(13). In Section 1101(a)(38), the term "United States" is defined as including Puerto Rico, Guam, and the Virgin Islands of the United States, "except as otherwise specifically herein provided." 8 U.S.C. § 1101(a)(38). Thus, pursuant to its plenary power over immigration matters, *see Landon v. Plasencia,* 459 U.S. 21, 34–5, 103 S.Ct. 321, 330–31, 74 L.Ed.2d 21 (1983), and over territories, *see, e.g., Harris v. Rosario,* 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980), Congress has chosen to specifically restrict travel from these three territories to the continental United States and other areas under U.S. jurisdiction in the manner provided in section 1182(d)(7). The wisdom or desirability of this choice has not been raised by plaintiff's facial challenge and is not before us.[12] Thus, we find in the stat-

11. The Due Process clause of the Fifth and/or Fourteenth Amendments applies to residents of Puerto Rico. *Calero-Toledo v. Pearson Yacht Leasing,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974).

12. Charles Gordon reports that "[t]hese special restrictions have been criticized as unwise and unsound[,]" citing a Presidential Commission Report. 1 C. Gordon & H. Rosenfield Immigration Law and Procedure, § 2.4c and note 16. It

ute adequate notice to all persons leaving Puerto Rico, Guam or the United States Virgin Islands and bound for the mainland United States or any other place under United States jurisdiction that they may be required to explain their immigration status for purposes of determining whether they are members of any class to be excluded under section 1182(d)(7).

## C. *Plaintiff's Facial Challenge to the Regulation and Challenge to INS' Promulgation of the Regulation*

Plaintiff has challenged the regulation promulgated pursuant to the statute on the grounds that it too is void for vagueness [13] and that it was promulgated *ultra vires* and with the intent to discriminate against U.S. citizens such as plaintiff in violation of the Fifth Amendment by infringing their right to travel.[14] We examine first the statutory challenge in accordance with the doctrine that, where an issue may be decided on either statutory or constitutional grounds, a court should inquire first into the statutory question; adjudication of constitutional questions should be made only when unavoidable. *E.g., Harris v. McRae,* 448 U.S. 297, 306–7, 100 S.Ct. 2671, 2682–83, 65 L.Ed.2d 784 (1980), *citing Spector Motor Service, Inc. v. McLaughlin,* 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944).

Section 235.5 of Title 8 of the Code of Federal Regulations, which plaintiff challenges, establishes a procedure called "preinspection" to implement the directive of Section 1182(d)(7) to exclude from admission aliens not otherwise exempted by the Act. Section 235.5 reads as follows:

(a) In United States territories and possessions. In the case of any aircraft proceeding from Guam, Puerto Rico, or the Virgin Islands of the United States destined directly and without touching at a foreign port or place to any other of such places or to one of the States of the United States or the District of Columbia, the examination required by the [A]ct of the passengers and crew may be made prior to the departure of the aircraft, and in such event, final determination of admissibility shall be made immediately prior to such departure. The examination shall be conducted in accordance with sections 234, 235, 236 and 237 of the [A]ct and this part and Parts 236 and 237 of this chapter, except that if it appears to the examining immigration officer that any person in the United States being examined under this section is prima facie deportable from the United States, further action with respect to his examination shall be deferred and further proceedings conducted as provided in section 242 of the Act and Part 242 of this chapter. When the foregoing inspection procedure is applied to any aircraft, persons examined and found admissible shall be placed aboard the aircraft, or kept at the airport separate and apart from the general public until they are permitted to board the aircraft. No other person shall be permitted to depart on such aircraft until and unless he is found to be admissible as provided in this section.

8 C.F.R. § 235.5 (1986). This section refers, in pertinent part, to Section 235 of the Act in mandating the examination proce-

---

is noteworthy that similar special limitations on travel by aliens were imposed by the Immigration Act of 1917, which were continued in the Act of 1952. Originally, this section of the 1952 Act was applicable to travel from Alaska and Hawaii; these restrictions were eliminated by the acts under which Alaska and Hawaii achieved statehood. *See* Sec. 23, Act of July 7, 1958, 72 Stat. 351; Secs. 19–21, Act of March 18, 1959, 73 Stat. 12.

**13.** Although plaintiff's Amended Complaint at p. 51 states only a void-for-vagueness claim, plaintiff's Motion in Opposition to Defendant's Mo-

tion for Summary Judgment states his argument as including the allegation that "8 CFR 235.5 ... is facially overbroad." Motion in Opposition, filed February 21, 1985, at 12.

**14.** At first glance, plaintiff's amended pleading appears as a Fifth Amendment equal protection challenge to the regulation; however, it is clear from plaintiff's brief of February 21, 1985 that plaintiff is raising an argument based on the constitutional right to travel. Plaintiff's Motion in Opposition to Defendant's Motion for Summary Judgment, February 21, 1985, at 16–17.

dure to be followed. Section 235, 8 U.S.C. § 1225, establishes the inspection powers of immigration officers in determining whether an alien is excludable.[15]

■ Plaintiff argues that this regulation is unauthorized to the extent that it treats travel of resident aliens and citizens from Puerto Rico to the United States as "entries" into the United States. Upon review of the statute as a whole, we cannot agree.

Deference is to be given an agency regulation unless there are compelling indications that the administrative construction is wrong. *Red Lion Broadcasting, Inc. v. Cox,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). As noted *supra,* Congress has chosen to provide in 8 U.S.C. § 1182(d)(7) a specific exception to the definition of "entry" for purposes of establishing a secondary border at which to exclude particular classes of excludable aliens. However, unless one is found to be in one of the classes to be excluded under

1182(d)(7), the mere fact of traveling from Puerto Rico to the continental United States or any other place under U.S. jurisdiction does not constitute an "entry" for purpose of subjection to the inspection law.[16]

A reading of this regulation reveals that it establishes a preflight inspection which contemplates not only the exclusion of those aliens specified in Section 1182(d)(7), but also other aliens suspected of being in violation of the immigration laws. The regulation provides in pertinent part that "the examination required by the [A]ct [section 1182(d)(7)] ... may be made prior to the departure of the aircraft, ... [and] shall be conducted in accordance with section 234, 235, 236 and 237 of the [A]ct [8 U.S.C. §§ 1224, 1225, 1226 and 1227] ... except that *if it appears* to the examining immigration officer *that any person* in the United States being examined under this

---

**15.** This section states in pertinent part:

(a) ... All aliens arriving at ports of the United States shall be examined by one or more immigration officers ... The Attorney General and any immigration officer, including special inquiry officers, shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, pass through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service, and, where such action may be necessary, to make a written record of such evidence. Any person coming into the United States may be required to state under oath the purpose or purposes for which he comes, the length of time he intends to remain in the United States pemanently and, if an alien, whether he intends to become a citizen thereof, and such other items of information as will aid the immigration officer in determining whether he is a national of the United States or an alien and, if the latter, whether he belongs to any of the excluded classes enumerated in section 1182 of this title.

.        .        .        .        .

(b) Every alien (other than an alien crewman), and except as otherwise provided in subsection (c) of this section and in section 1323(d) of this title, who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt

entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer ...

8 U.S.C. § 1225(a), (b) (in pertinent part).

As plaintiff points out, section 1225(a) refers to the examination of "[a]ll aliens *arriving* at ports of the United States." (emphasis supplied). It is arguable that Congress intended the additional screening of aliens subject to § 1182(d)(7) to be done upon arrival at the coast of the mainland destination or other destination subject to U.S. jurisdiction. *See e.g.,* statements of Rep. Walter in floor debate quoted in *Alcantra v. Boyd,* 222 F.2d 445 at 449 (9th Cir.1955). We find the issue nondeterminative. It may prove more cost-effective to screen the excludable aliens at the point of departure since some may qualify to remain there.

**16.** Courts have held that travel from Puerto Rico, or Guam to the United States does not constitute an "entry" for purposes of triggering deportation proceedings. *Savoretti v. Voiler,* 214 F.2d 425 (5th Cir.1955) (travel of alien resident from Puerto Rico to the U.S. mainland; decision under Act of 1917); *U.S. v. Paquet,* 131 F.Supp. 32 (D.Hawaii 1955) (travel of permanent resident from Guam to U.S. mainland). *See also Barber v. Gonzáles,* 347 U.S. 637, 74 S.Ct. 822, 98 L.Ed. 1009 (1954) (travel of U.S. national from Philippines as U.S. territory to mainland United States not an entry for deportation purposes); *Alcantra v. Boyd,* 222 F.2d 445 (9th Cir.1955) (resident aliens traveling from territory of Hawaii to U.S. mainland not included in scope of § 1182(d)(7)).

section *is prima facie deportable* from the United States, further action with respect to his examination shall be deferred and *further proceedings conducted as provided in section 242 of the [A]ct* [8 U.S.C. § 1252] ..." 8 C.F.R. § 235.5(a). (emphasis supplied).

A careful reading of this regulation with the proper deference allows for an interpretation that the regulation on its face does not mandate the exclusion of aliens exempt from exclusion at this secondary border under (d)(7) [those in paragraphs (20), (21) and (26)]. The words "examination required by the Act" in the regulation can be interpreted to mean the examination required by section (d)(7), thus allowing for an exclusion of those aliens exempted from this procedure. In addition, the regulation requires examination in accordance with section 237, 8 U.S.C. § 1227(a)(1). Although that section mandates the immediate deportation of *any* alien "who is excluded under this chapter", the words "under this chapter" in the statute should be read to include the (d)(7) exempt classes at this secondary border.

■ The same restrictive interpretation cannot be given to the regulation's treatment of aliens who have entered the United States as defined by the Act and are deportable pursuant to deportation proceedings under section 242, 8 U.S.C. § 1252. The regulation plainly includes these aliens within the scope of the preflight inspection fruits. We agree with plaintiff that this inclusion is outside the intent of Congress expressed in section 1182(d)(7), which establishes a limited group of classes to be excluded at this secondary border. We thus must inquire whether the INS is otherwise authorized to establish such a procedure.

Since the airports of Guam, Puerto Rico and the U.S. Virgin Islands are *within the United States* for immigration purposes outside the limited (d)(7) purpose, our inquiry into whether the INS is authorized to establish this procedure essentially involves the analysis of whether the INS has authority to operate a permanent fixed checkpoint at an inland place within the United States for examination of *all* passers-by. Such operations have been upheld pursuant to statutory authorization under, *inter alia,* 8 U.S.C. §§ 1357(a)(1), empowering immigration agents to interrogate those believed to be aliens as to their right to be in the United States. *E.g., U.S. v. Martinez-Fuerte,* 428 U.S. 543, n. 8, 96 S.Ct. 3074, n. 8, 49 L.Ed.2d 1116 (1976). The agency's choice of checkpoint location and manner of operation in any particular case is, of course, subject to judicial review under an abuse of discretion standard. *Id.* at 559, nn. 13, 15, 96 S.Ct. at 3083, nn. 13, 15.

Pertaining to plaintiff's challenge of the regulation's Puerto Rico location, we believe the agency's decision to locate a checkpoint at the Isla Verde airport was reasonable. The location represents the major route to the U.S. mainland from the island and, if operated properly, would restrict any passage to the mainland around the checkpoint. In addition, the evidence supports the conclusion that the needs of immigration enforcement are furthered by this location. See Findings of Fact 11, 12. *See Martinez-Fuerte,* 428 U.S. at 553, 559, nn. 13, 15, 96 S.Ct. at 3080–81, 3083, nn. 13, 15.

■ Plaintiff further charges that the INS promulgated the regulation with the intent to infringe on U.S. citizens' and resident aliens' constitutional right to travel. Plaintiff refers to the regulation's effect as evidence of animus but fails to define whether he is referring to the right to interstate travel or to international travel.[17] The right to travel from Puerto Rico, to the continental United States or any other

---

**17.** The right to interstate travel is recognized as a fundamental constitutional right which arises from no particular source. *U.S. v. Guest,* 383 U.S. 745, 757–58, 86 S.Ct. 1170, 1177–78, 16 L.Ed.2d 239 (1966). The right to international travel is an aspect of the liberty interest guaranteed by the Fifth and Fourteenth Amendment due process clauses. *Aptheker v. Sec. of State,* 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); *Kent v. Dulles,* 357 U.S. 116, 125, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958).

place within U.S. jurisdiction has not yet been designated as either interstate or international travel. *Cf. Califano v. Torres,* 435 U.S. 1 n. 6, 98 S.Ct. 906 n. 6, 55 L.Ed.2d 65 (1978) (right to travel between Puerto Rico and any one of the 50 states of the United States assumed to be right of interstate travel).. Nevertheless, under either standard, plaintiff has failed to carry his burden of proving that an intent to infringe on the right to travel was a motivating factor in the INS' decision. *See Village of Arlington Heights v. Metropolitan Housing Development,* 429 U.S. 252, 264–272, 97 S.Ct. 555, 562–67, 50 L.Ed.2d 450 (1977). Even assuming that such a motive can be inferred from the totality of the relevant facts before us, *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976), we find that the welfare of the nation as a whole furthered by enforcement of the immigration laws well outweighs the interest of the individual in traveling free of this governmental intrusion. Plaintiff's argument is better stated as a Fourth Amendment claim which we address at Part II, E, *supra.*

■ Plaintiff also challenges the regulation on its face on constitutional grounds. Plaintiff argues that the regulation's references to examination of "any person" and "passengers and crew" are vague and overbroad.[18] We cannot agree. The regulation's plain language contemplates the examination of every person passing through the checkpoint. As such, it gives adequate notice to both travelers and law enforcement officials as to who will be subjected to the examination. Nor can we find the regulation to be *facially* overbroad[19] for the reasons stated in our analysis of the statutory basis for the regulation.

### D. *Plaintiff's Equal Protection Challenge*

■ Plaintiff charges that the statute and regulation before us are unconstitu-

tional as applied under the Fifth and Fourteenth Amendment equal protection guarantees because plaintiff as a U.S. citizen has been subjected to arbitrary and indiscriminate examination by the INS solely on the basis of his ancestry. We admit some bewilderment at plaintiff's insistence that "indiscriminate" examination has been conducted in a discriminatory manner on the basis of ancestry, but we take plaintiff's argument to be a claim that ancestry as a suspect classification is the ground upon which the INS chooses whom to interrogate at the airport checkpoint. Plaintiff has advanced no particulars in his brief, relying rather on conclusory and energetic allegations. We briefly address the issue.

The constitutional guarantee of equal protection under the law applies to residents of Puerto Rico under either the Equal Protection component of the Fifth Amendment Due Process clause or the Equal Protection clause of the Fourteenth Amendment. *Examining Board v. Flores de Otero,* 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976). This guarantee is not, of course, without limitation. In a situation like the one facing immigration officials in Puerto Rico, where Spanish-speaking U.S. citizens and permanent residents of various ancestral origins live side by side with Spanish-speaking aliens who may or may not be in violation of the immigration laws, INS agents are trained to discriminate on the basis of accent and other behavioral characteristics as well as such blatant traits as ancestry. We find nothing unconstitutional in the alleged reliance of the agents on, among other factors, plaintiff's appearance, in questioning him regarding his citizenship. Such reliance in the context of checkpoint questioning has been upheld against Fourth Amendment challenges. *Martinez-Fuerte,* 428 U.S. at

---

**18.** *See* note 13 *supra.*

**19.** Plaintiff has not charged that the regulation is overbroad as applied. Such a challenge would likely have met with success since the facts support a finding that INS inspectors are examining not only passengers flying to the

continental United States or other points within U.S. jurisdiction, but also passengers entering the same gate areas for flights to other Caribbean countries, to Central America, and to France. *See* Finding of Fact No. 9 and note 5, *supra.*

563, 96 S.Ct. at 3085 (checkpoint referrals of motorists to secondary inspection made largely on basis of apparent Mexican ancestry not unconstitutional). *Cf. U.S. v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (roving patrol stops of motorists solely on the basis of apparent Mexican ancestry unconstitutional). There can be little doubt that the governmental interest in immigration enforcement furthered by distinguishing ancestry is compelling in contrast to the minimal intrusion experienced by plaintiff.

Plaintiff further charges an unlawful taking of his liberty without due process under the Fifth Amendment. This claim is in actuality a restatement of plaintiff's Fourth Amendment claim, and we decide it along with our Fourth Amendment analysis which follows.

### E. *Plaintiff's Fourth Amendment Challenge*

Plaintiff also alleges that defendants acted in violation of the Fourth Amendment by detaining him and invading his privacy at the Isla Verde airport. Plaintiff raises two incidents in particular as support, one occurring in July 1982 and the other in October 1982.

■ We find plaintiff's claim as to the July 1982 incident to be time-barred. In an action such as this, where the enforcement of a federal right gives rise to concurrent remedies in law[20] and equity for which Congress has not provided a statute of limitations, we apply the statute of limitations for the concurrent legal remedy. 2 *J. Moore and J. Lucas*, Federal Practice § 3.07[3], [4.–1] (1986). *See Cope v. Anderson*, 331 U.S. 461, 464, 67 S.Ct. 1340, 1341–42, 91 L.Ed. 1602 (1947). Based on the reasoning of *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) set out in our Opinion and Order, October 31, 1984 at 7, we apply the local

tort statute of limitations to this claim, as would be applied to an analogous claim under 42 U.S.C. § 1983. *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). The Puerto Rico tort statute of limitations is one year. 31 L.P.R.A. 5298. Thus plaintiff is barred from bringing any claims based on incidents which occurred prior to September 30, 1982.

■ We now turn to the October 1982 action alleged to have violated the Fourth Amendment. In the October 1982 incident of which plaintiff complains, plaintiff encountered two INS agents at a checkpoint unmarked by podium or any other structure and was asked his citizenship. Plaintiff failed to reply, presenting instead a card which read "Do you believe I am an alien?". Plaintiff was impeded from proceeding through the security inspection to board his flight because his luggage was not sent through the X-ray machine and because a security guard stood in his way. He eventually left the departure area without boarding his flight.

If the INS agents had stopped plaintiff only for purposes of exclusion of the aliens specified under § 1182(d)(7), then their actions against plaintiff would not implicate the Fourth Amendment since the checkpoint *for these purposes* is nothing less than a border inspection and their actions were well within the Fourth Amendment standard for border stops. *See, e.g., U.S. v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). However, the INS has chosen to institute this checkpoint for other uses as well—to apprehend both aliens not excludable under § 1182(d)(7) and aliens who are or may be deportable. For these additional purposes, the INS is operating a checkpoint within the borders of the United States, and the Fourth Amendment standard is more stringent.[21]

---

**20.** Plaintiff's suit for damages under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) was adjudicated by our Opinion and Order of October 31, 1984.

**21.** The Fourth Amendment applies to the residents of Puerto Rico, either directly or through the Fourteenth Amendment. *Torres v. Puerto Rico*, 442 U.S. 465, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979).

The Fourth Amendment imposes a reasonableness requirement on all seizures of the person in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals. The key principle in the application of this requirement of reasonableness is the balancing of competing interests—the interest of the government in law enforcement and the interest of the individual in his or her reasonable expectation of privacy. *Michigan v. Summers*, 452 U.S. 692, 700, n. 12, 101 S.Ct. 2587, 2593, n. 12, 69 L.Ed.2d 340 (1981).

The enormous interest of the government in enforcement of the immigration laws has been noted in several recent Supreme Court decisions. *See, e.g., INS v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 1766, 80 L.Ed.2d 247 (1984) (Powell, J. concurring); *U.S. v. Martinez-Fuerte*, 428 U.S. at 551–52, 96 S.Ct. at 3080. In the case before us, the purpose of the checkpoint questioning is legitimate and the need for the checkpoint as an INS enforcement technique on the island is demonstrated by the record.

Against this interest we balance the intrusiveness of the procedures followed in this checkpoint. There is much in the record to support a finding that the October 1982 intrusion was modest. Although at the time of the incident, the checkpoint's appearance afforded no advance notice to passengers that they would be questioned,[22] the agents appeared to be questioning all who passed, thus producing a sense that the checkpoint procedure was being conducted in an orderly and predictable manner. Secondly, two agents were on duty so that when a particular passenger

necessitated more questioning, neither that passenger nor other passengers were made to wait while inspection continued. Thirdly, the passengers were in a public airport, the flight-age equivalent of the highway, and, as such, a location where one's reasonable expectation of privacy is low.[23] Finally, the historical precedent which undergirds the use of road checkpoints and diminishes the average motorist's fear because of the accustomed existence of checkpoints applies by analogy to this airport checkpoint located where there is no other convenient road out of Puerto Rico.

Thus, considering the totality of the demonstrated circumstances surrounding the time of the incident, the Court can find no Fourth Amendment violation in the October 1982 incident. Neither the initial questioning of plaintiff by the two agents nor the secondary questioning of plaintiff by agent Figueroa required reasonable suspicion on the part of the agents. *U.S. v. Martinez-Fuerte*, 428 U.S. at 562–63, 96 S.Ct. at 3085. *See also Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (interrogation relating to identity impliedly not a Fourth Amendment seizure).

We certainly cannot sanction a dogged insistence by an agent to force a passenger to answer the question regarding citizenship absent any reasonable suspicion to validate the detention. *See e.g., Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), *explained in INS v. Delgado*, 104 S.Ct. at 1763. However, the plaintiff before us has not met his burden of proving that defendant Figueroa took such additional steps to obtain an answer

---

**22.** We note that, for purposes of this opinion, the physical appearance of the Eastern checkpoint at the airport has been improved to provide advance notice to passengers of an upcoming inspection procedure, thus mooting the need to grant injunctive relief as to this checkpoint. The parties have submitted, however, evidence as to other checkpoints. See Finding of Fact 6 and note 4 *supra*. Inasmuch as our opinion sets forth guidelines as to the proper form for location and operation of the checkpoint, we urge the defendant to take the necessary actions to

bring all airport checkpoints into compliance with those guidelines.

**23.** The fact that this immigration checkpoint is located in an airport in Puerto Rico, a stepping-stone to the continental United States for many Caribbean aliens, diminishes the element of surprise that immigration enforcement would be conducted at such a point. *See United States v. Boyd*, 222 F.2d 445, 448 (9th Cir.1955), *quoting* letter of Sec. of Labor, S.Doc. No. 451 at 3–4. *See also* Finding of Fact 10, *supra*.

as would constitute a Fourth Amendment seizure. Without the agents' believing that the inspection was completed, we cannot hold unconstitutional their conduct in impeding plaintiff's access to his plane and, as plaintiff himself admits, he was free to take his luggage and leave the area of inspection without any attempt of the agents to detain him. We emphasize today that our decision as to this incident is limited to the facts of this incident alone; plaintiff has not alleged that the statute and regulation at issue are unconstitutional as applied under the Fourth Amendment.

In accordance with the above Findings of Fact and Conclusions of Law, the Court will enter Judgment for the defendants and against the plaintiff on the plaintiff's claims to declaratory judgment and injunctive relief.

IT IS SO ORDERED.

## APPENDIX I
## COMPARISON BETWEEN AIRPORT APPREHENSIONS AND OTHER TYPES OF INS ENFORCEMENT ACTIVITY

| Month/Year | Airport [1] | Yolas [2] | Other [3] | Walk-Ins [4] |
|---|---|---|---|---|
| Jan. 1984 | 21 | 62 | 8 | 2 |
| Feb. 1984 | 23 | 57 | 18 | 5 |
| Mar. 1984 | 23 | 28 | 32 | 5 |
| Apr. 1984 | 17 | 32 | 14 | 7 |
| May 1984 | 17 | 57 | 27 | 11 |
| June 1984 | 20 | 59 | 17 | 9 |
| July 1984 | 31 | 9 | 38 | 13 |
| Aug. 1984 | 20 | 41 | 47 | 35 |
| Sept. 1984 | 16 | 93 | 14 | 6 |
| Oct. 1984 | 23 | 12 | 29 | 9 |
| Nov. 1984 | 21 | 42 | 62 | 8 |
| Dec. 1984 | 22 | 0 | 40 | 3 |
| Jan. 1985 | 13 | 15 | 43 | 7 |
| Feb. 1985 | 15 | 0 | 30 | 13 |
| Mar. 1985 | 35 | 0 | 50 | 11 |
| Apr. 1985 | 32 | 21 | 29 | 1 |

[1] "Airport" cases are those detected by immigration inspectors conducting preinspection of passengers who are traveling to the continental United States.

[2] "Yola" cases are those where an alien reaches the coast of Puerto Rico by boat and is encountered within 72 hours from the time of arrival. The initial apprehension may be by the Police Department of Puerto Rico, Coast Guard, Natural Resources Rangers, or by INS investigators.

[3] This "Other" category refers to aliens apprehended by the Police State Department while involved in criminal activity, aliens referred to INS by the airlines or customs officials, or aliens encountered by INS investigators while illegally employed, etc.

[4] "Walk-ins" are those individuals who present themselves to the INS either at the main office or at the airport and ask to be returned to their country of origin or to be placed in deportation proceedings to apply for some benefit under the Immigration and Nationality Act.