820 F.2d 1359
 56 USLW 2044, Bankr. L. Rep. P 71,879
 VANCOUVER WOMEN'S HEALTH COLLECTIVE SOCIETY; Women's Health
Clinic, Inc.; Council for the Status of Women of
Dublin, Ireland, Plaintiffs-Appellants,
v.
A.H. ROBINS COMPANY, INCORPORATED, Defendant-Appellee,
Official Committee of Equity Security Holders, Intervenor.
NATIONAL WOMEN'S HEALTH NETWORK; Ubinig, Plaintiff-Appellant,
v.
A.H. ROBINS COMPANY, INCORPORATED, Defendant-Appellee,
Official Committee of Equity Security Holders, Intervenor.
COMMITTEE OF DALKON SHIELD CLAIMANTS, Plaintiff-Appellant,
v.
A.H. ROBINS COMPANY, INCORPORATED, Defendant-Appellee.
 Nos. 86-1159, 86-1170 and 86-1196.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 4, 1987.
Decided June 17, 1987.
 
 Mark Charles Ellenberg (James F. Wallack, William H. Merrill, Cadwalader, Wickersham & Taft, Washington, D.C., on brief), for plaintiffs-appellants.
 James Strother Crockett, Jr. (William R. Cogar, Clifford W. Perrin, Jr., Linda J. Thomason, Mays & Valentine, Richmond, Va., on brief), James MacNeill Nolan (Robert M. Miller, Bishop, Liberman & Cook, Michael L. Cook, Dennis J. Drebsky, Skadden, Arps, Slate, Meagher & Flom, New York City, Ross C. Reeves, Willcox & Savage, Norfolk, Va., on brief), for defendant-appellee.
 Before RUSSELL, WIDENER and CHAPMAN, Circuit Judges.
 CHAPMAN, Circuit Judge:
 
 
 1
 This appeal presents another chapter in the continuing saga of Dalkon Shield litigation. The Dalkon Shield Claimants' Committee appeals the denial of its motion for an extension, or abolishment of the Bar Date for foreign claimants. The Committee argues that the notification program which Robins developed at the district court's direction was insufficient to notify users of the Dalkon Shield outside the United States of their legal rights. Because we find that the notification program was adequate under the circumstances, we affirm the order of the district court denying appellant's motion.
 
 
 2
 * This occasion marks the fourth time that this court has been asked to review decisions rendered in In Re: A.H. Robins Company, No. 85-1307-R (Bankr.E.D.Va.). The litigation centers around the intrauterine contraceptive device known as the Dalkon Shield which Robins manufactured and distributed. The Dalkon Shield was found to cause a variety of injuries to women. In 1984, Robins undertook a $4.5 million global media campaign, the purpose of which was to alert women to the potential harm which might accompany the use of the Dalkon Shield, and to offer to pay the reasonable medical costs of removing the device. By August 1985, over 5,000 suits seeking compensatory and punitive damages were pending against Robins.
 
 
 3
 In August 1985, Robins filed a petition under Chapter 11 of the Bankruptcy Code. Because this case is vastly complex and includes the unusual element of hundreds of thousands of personal injury tort claims which are pending against the petitioner, the district court withdrew its standing order of reference to the bankruptcy court and assumed jurisdiction over most proceedings.
 
 
 4
 Robins filed a multipurpose motion requesting the court to set a Bar Date for claims, to approve an appropriate form of notice for potential claimants, and to approve a procedure by which the notice could be disseminated world wide. The issues raised by the motion were briefed by all interested parties. In November of 1985, after a hearing and much discussion among the parties, the court entered an order which, among other matters, set the bar date as April 30, 1986, established the form of notice to be disseminated to trade creditors, stockholders, and potential Dalkon Shield claimants, and created a procedure by which Robins would disseminate this notice to the world.
 
 
 5
 The order encompassed the parties' agreement regarding the methods of notice dissemination which would be required, one method aimed entirely at foreign countries and the other focused on the United States. Regarding the foreign notification program, the pertinent portion of the court's order states:
 
 
 6
 That Robins shall notify all persons or entities of the Bar Date by implementing the following procedure:
 
 
 7
 * * *
 
 
 8
 * * *
 
 
 9
 b. Foreign Notice: On or before January 31, 1986, Robins shall conclude a public-relations program designed to give notice regarding the Bar Date and related matters in foreign countries through news releases, press conferences, public service announcements, and letters to health ministers and medical associations. The program shall be tailored to the specific countries in which the Dalkon Shield was marketed or known by Robins to have been used and Robins shall provide information packets to American embassies located in each of these countries. All elements of this program shall specify U.S.A. when listing the address for claims.
 
 
 10
 (emphasis added).
 
 
 11
 Acting, as it is, upon a voluntary petition of bankruptcy, the district court has tried to satisfy its obligation to balance the interests of potential Dalkon Shield claimants against those of both Robins' creditors and actual Dalkon Shield claimants. Therefore, the district court limited the amount of money which Robins could spend on its notification program to five million dollars, but, the cost of implementing both the foreign and domestic programs has been approximately four million dollars.
 
 
 12
 In December 1985, Robins submitted a detailed outline of its notification program. Implementation of the program began on January 6, 1986, and was largely completed by January 31, 1986. On January 14, 1986 the Claimants' Committee objected to the notice program in a "Supplemental Memorandum Concerning Notice." The Memorandum identified twelve objections to the notification program, only three of which pertained specifically to the foreign notice program. The Claimants' Committee requested a news conference in Cairo, Egypt, sought modification of a background handout that was being distributed in the foreign notice program and, expressed general, unspecified concerns about the budget and scope of the foreign notice program. The news conference in Egypt had been canceled because the Egyptian government had responded to the announcement of a news conference with hostility and threats. The background handout had been before the district court since December 18, 1985 without objection by the Claimants' Committee. Finally, the general concerns about the budget and scope of the foreign notice program were not sufficiently specific to provide Robins with notice of what the Claimants' Committee desired.
 
 
 13
 In its efforts to satisfy the court's order regarding foreign notification, Robins hired Burson-Marsteller, a public relations agency with offices throughout the world, to design and implement the foreign notification program in ninety foreign countries. Burson-Marsteller was not constrained by budgetary limitations in the planning stages. Instead, Robins asked Burson-Marsteller to devise an appropriate program for disseminating the Bar Date message worldwide and then to estimate the cost of such an undertaking. The estimate of Burson-Marsteller for the foreign notification program it was one million dollars. This figure was subsequently incorporated into the budget order of the district court.
 
 
 14
 The foreign notification program was designed to disseminate notice of the Bar Date as widely as possible using public relations rather than direct payment advertising. Burson-Marsteller estimated that an international paid advertising program commensurate with the domestic program could cost as much as forty to fifty million dollars. Therefore, a public relations format was devised which offered substantial savings and, it was hoped, certain advantages over the use of paid advertising.
 
 
 15
 The foreign notification program was premised upon two fundamental principles of public relations. First, the program was intended to utilize fully persons and organizations which could effectively communicate the message of the Bar Date to others. These groups included not only the mass media, but also medical organizations, health officials, government agencies and ministries. Second, by saturating the mass media with press conferences and press releases in a short period of time, the notification program itself was intended to become "news" to be reported by wire services, newspapers, radio and television. This type of information dissemination also lessened the control of Robins respecting the content of the message.
 
 
 16
 The materials which formed the nucleus of the foreign notification program were a press release, a background handout, a letter to foreign health ministers, a letter to medical associations, a letter to American embassies, a public service announcement for print media, and a script for radio and television public service use. All of the materials, except the letter to American embassies, were translated into every official language of each of the ninety countries--a total of twenty-nine languages. The press release, background handout, and public service announcements comprised a press packet that was issued to all daily media outlets in the ninety countries, including newspapers, and radio and television stations.
 
 
 17
 Press conferences were held in sixteen countries during January 1986. With one exception, the press conference sites were major international media centers from which the story of the Bar Date could be expected to disseminate beyond the immediate areas. The exception was Wellington, New Zealand, where a press conference was scheduled because of previous interests in the Dalkon Shield in that country. The sixteen press conferences attracted over three hundred and fifty reporters. Information was provided directly to all major international wire services and, the information was disseminated through diplomatic channels. The Agency for International Development sent a telex to all its missions in countries with which the United States has diplomatic relations. Press packets were provided to more than two hundred foreign correspondents in Washington, D.C. International Planned Parenthood in New York, the United States State Department, the World Health Organization in Geneva, and UNESCO in Paris were contacted directly.
 
 
 18
 The public relations information was received directly by approximately forty-eight hundred media outlets worldwide. Because the story of the Bar Date also was carried by all major international wire services, Burson-Marsteller concluded that the story was received, either directly or through the wire services, by every daily news outlet in the world. Moreover, the story was broadcast over radio stations in many countries. Both the British Broadcasting Company and the Voice of America carried the story internationally. In addition, Burson-Marsteller reports that 770 personal contacts with the media or public officials were made. Information was received by 567 media organizations, plus 447 planned parenthood units. A total of 5,760 other organizations also received the information.
 
 
 19
 The Claimants' Committee argument that notice was insufficient is based upon a variety of factual allegations regarding the alleged insufficiency of the notice to potential foreign claimants. The Claimants' Committee points out that statistically, the percentage of claims per Dalkon Shield sold is vastly higher in the United States than in the foreign markets. In the United States, there was a response rate of 10.09 percent. In Canada, the response rate before the Bar Date was only 3.29 percent. Similarly, in France, the response rate was .21739 percent and, in Mexico the response rate was found to be .000894 percent.
 
 
 20
 Appellant also presents evidence in affidavit form that certain news outlets did not receive the information packets. For example, in oral argument, appellant mentioned the statement by an Irish woman that she had never seen any mention of the Dalkon Shield in the newspaper for which she was employed; Robins, however, submitted to this court newspaper clippings from that very newspaper which showed that the Dalkon Shield information had been published therein. The Claimants' Committee also mentions a variety of "cultural" mistakes which occurred under Robins' informational distribution scheme. For example, in certain areas of Central America, the Dalkon Shield is known only as a "pescadita". Robins information packets, in Spanish, did not contain this phrase; however, as Robins pointed out, the news agencies in these countries, aware of the colloquialism, referred to the Dalkon Shield as a "pescadita" in their articles concerning the Bar Date.
 
 
 21
 The appellant moved for an extension or abolition of the Bar Date. The appellant contended, among other things, that the potential foreign claimants had a constitutional right to adequate notice which had been violated by the allegedly insufficient foreign notice program and that notice by publication did not include the dissemination of information through press releases.
 
 II
 
 22
 Appellant argues that the foreign notice program was unconstitutional. The Constitution does not extend its guarantees to nonresident aliens living outside the United States. Because foreign claimants are not protected by the Constitution, there is no merit to the constitutional claim.
 
 
 23
 While the Supreme Court has not specifically held that nonresident aliens do not enjoy the rights and privileges provided by the United States Constitution, it has intimated that rights under the U.S. Constitution extend only to citizens and to "individuals" within the jurisdiction of the United States. See Mathews v. Diaz, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976) (aliens living within the jurisdiction of the United States are protected by Constitution and its guarantees, despite the fact that such presence is unlawful, involuntary or transitory). See also, Wong Wing v. United States, 163 U.S. 228, 230, 16 S.Ct. 977, 978, 41 L.Ed. 140 (1896) (all persons within the territory of the United States are entitled to protection guaranteed by the Constitution). The Supreme Court has also held that non-citizens' constitutional rights do not attach until such non-citizens are within the territorial jurisdiction of the United States. An alien, seeking initial admission to the United States, requests a privilege and does not have any constitutional rights regarding his application; however, once an alien gains admission to this country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly. Landon v. Plasencia, 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982).
 
 III
 
 24
 Appellant's argument also implies that even absent Constitutional strictures, the notice provided was insufficient. The decision not to extend the Bar Date deadline is within the sound discretion of the district judge. This court will reverse such a decision only upon a showing of a clear abuse of discretion by the court below. See Matter of GAC Corp., 681 F.2d 1295, 1301 (11th Cir.1982). Appellant has not carried the burden of showing that there was an abuse of discretion, therefore, they have not shown through their presentation that the order of notification should have been amended.
 
 
 25
 There are too many imponderables in dealing with notification of potential claimants on a worldwide basis, particularly involving this product. It seems extremely likely that cultural differences, including modesty regarding sexual practices, religious prohibitions against contraception, and a simple absence of the litigious nature which characterizes the American public, may have led to the discrepancy between the number of claims filed from other countries and the number of claims filed from the United States.
 
 
 26
 It is interesting to note that in Canada, where the vast majority of the population comes in frequent contact with American television and radio, a response rate of only 3.29 percent was recorded. While the appellant argues that the response rate would have been higher had the Canadian media been as saturated with advertisements as was the American media, we believe that the statistics are equally indicative of the fact that Canadians are not as litigious as Americans. Interestingly, Australia, an English speaking country that does not receive American television or radio broadcasts had a response rate of approximately 4.5 percent, twenty five percent higher than the rate in Canada.
 
 
 27
 Even where there exists a Constitutional right to notice, the right to adequate notice simply requires that the proposed form of notification be reasonably certain to inform those affected. Where conditions do not reasonably permit a more adequate notice, the form of notice chosen must not be substantially less likely to bring home notice than other feasible and customary substitutes. Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306, 314-315, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). In this case, Robins hired an advertising firm and directed it to develop and implement a plan to disseminate the information in a reasonable fashion. The fact that not all the potential claimants filed claims before the Bar Date, and the fact that the response rate was lower in foreign countries than it was in the United States do not suggest that the program itself was unreasonable. Frequently, reasonable plans of notification are never contested because notices, particularly legal notices in newspapers, go unnoticed by potential claimants who lose their rights. The fact that some individuals may lose their rights under the law does not mean that an initial notification program is unreasonable.
 
 
 28
 We find that the notification program used by Robins was, under the circumstances, reasonable. The evidence indicates that every news outlet in the world received the information. Similarly, there is fairly strong evidence that the news was broadly disseminated worldwide. A battery of world health and welfare organizations also disseminated the information. It appears to this court that the extensive notification program was a success. Women from such unlikely locations as Kenya, Botswana, Pakistan and Bangladesh ultimately filed claims. While it may be argued that the program could be better instituted if it were reformulated, this fact does not render it unreasonable. Virtually anything, if repeated, can be improved upon.
 
 IV
 
 29
 Finally, even applying the Constitutional standard of notice, it is clear to this court that the district court did not abuse its discretion in denying the appellant's motion. In bankruptcy, the court has an obligation not only to the potential claimants, but also to existing claimants and the petitioner's stockholders. The court must balance the needs of notification of potential claimants with the interest of existing creditors and claimants. A bankrupt estate's resources are always limited and the bankruptcy court must use discretion in balancing these interests when deciding how much to spend on notification. In this case, the district court did not abuse its discretion in approving Robins' plan for notification of foreign claimants. Given the many imponderables in dealing with notification of potential claimants on a worldwide basis, the appellant has simply not carried its burden of showing an abuse of discretion by the district court judge.
 
 V
 
 30
 Appellant also argues that the dissemination of information through press releases and information packets is not proper notice by publication as allowed under Bankruptcy Rule 2002(k). Under the Bankruptcy Rules, appropriate notice by publication is to be determined by the court, which shall determine the form and manner of publication, including the medium to be used and the number of publications. Bankruptcy Rule 9008. Because publication is not an advertisement in the media, but is rather an advising of the public or making note of something to the public for a purpose, we find the appellant's argument on this point to be meritless. See Estill County v. Noland, 295 Ky. 753, 763, 175 S.W.2d 341, 346 (1943); See also, Associated Press v. International News Service, 245 F. 244, 250 (1917).
 
 
 31
 For the aforementioned reasons, the order of the district court is hereby affirmed.
 
 
 32
 AFFIRMED.