**In re A.H. ROBINS COMPANY, INCOR-PORATED, Debtor, Employer's Tax Identification No. 54–0486348.**

**Gwendolyn SMITH, Movant,**

**v.**

**DALKON SHIELD CLAIMANTS TRUST, Respondent.**

**No. 85–01307–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

March 28, 1995.

Roger L. Pardieck, Pardieck, Gill & Vargo, Seymour, Indiana, for Gwendolyn Smith.

Melody G. Foster, Richmond, Virginia, for Dalkon Shield Claimants Trust.

### *MEMORANDUM*

MERHIGE, District Judge.

This matter is before the Court on Dalkon Shield Claimant Gwendolyn Smith's ("Movant") Motion for Leave to File a Late Claim. For the reasons which follow, the motion will be denied.

### I.

Movant had an IUD inserted in 1973. Until 1994, Movant alleges that she had always been healthy, and had no reason to perceive any health risk because she was always able to locate the string on her IUD, as instructed by her physician. In March, 1994, however, Movant underwent emergency surgery which resulted in a complete hysterectomy and the removal of a Dalkon Shield. *See* Movant's Motion, Ex. A.

Several weeks after Movant's surgery, the Trust announced a final deadline of June 30, 1994, for the submission of claims to the Trust.[1] The setting of a final deadline was compelled by the pending need to wind up the Trust's affairs. In particular, the Trust determined that it was essential, at this stage of the Trust's finite existence, to formulate accurate projections of (1) the Trust's ability to pay all Timely Claims, (2) the level of funds remaining, if any, to compensate valid Late Claims, and (3) the level of funds available, if any, for a *pro rata* distribution under CRF § G.14. In the Trustee's judgment, allowing an open window for the filing of late claims frustrated this undertaking, and they acted accordingly. Movant did not file a claim by this final deadline, and has consequently moved for leave to file a late claim on the basis that the Dalkon Shield caused her injuries.

### II.

■ Before examining the merits of Movant's motion, the Court must address a preliminary matter. Movant has submitted two affidavits in support of her motion. One was filed with her original motion, and suggests that she knew, at the time of insertion, that her IUD was a Dalkon Shield.[2] This affidavit also demonstrates that Movant, prior to her surgery, was aware that information had been provided to women regarding the Dalkon Shield.[3]

---

1. In 1985, this Court set April 30, 1986, as the bankruptcy bar date in the A.H. Robins bankruptcy proceedings. Pursuant to section G.14 of the Claims Resolution Facility ("CRF"), individuals who filed their Dalkon Shield claims prior to that date have Timely Claims. Individuals who submitted claims after that date have Late Claims which will only be paid to the extent funds remain after all Timely Claims are paid in full. CRF § G.14. The Trust set June 30, 1994, as the Late Claims Bar Date; in other words, any and all Dalkon Shield Claims had to be submitted by that date, or be forever barred.

2. Movant stated that she "had a Dalkon Shield IUD inserted in approximately August, 1973." Movant's Motion, Ex. B ¶ 3. She further stated that her doctor told her "[a]t the time [he] inserted the Dalkon Shield ... that as long as I could feel the string everything was fine." *Id.* ¶ 3.

3. "*I did not understand that information provided to women about problems related to the Dalkon Shield applied to me.* I followed by [sic] doctor's instruction to check for the string. Since I could feel my string I thought everything was fine." Movant's Motion, Ex. B ¶ 4 (emphasis added).

Movant's second affidavit, filed with her reply memorandum, contradicts statements made in the earlier filing. In particular, Movant denies that she knew, prior to surgery, that the IUD was a Dalkon Shield. Movant's Reply Mem., Ex. B ¶ 2. The more egregious inconsistency, however, is contained in the next paragraph, which provides in part:

> To the best of my recollection, I did not see or hear any advertisements, notices, or news reports regarding dangers associated with the Dalkon Shield IUD or any other IUD.... Prior to my surgery, I was not aware of this or that the Dalkon Shield or any other IUD had injured other women.

*Id.* ¶ 3.

Recognizing this conflict between the affidavits, Movant attempts reconciliation by suggesting that her original statement is ambiguous. Her position, however, is unconvincing as the first affidavit plainly and succinctly sets forth Movant's prior awareness that women had received information about the Dalkon Shield. *See supra* note 3. Thus, faced with conflicting affidavits, the Court determines that to the extent the affidavits are inconsistent, only the original affidavit will be considered in evaluating Movant's motion. Otherwise, Movant's chances of obtaining relief from the Trust's deadline would be improperly enhanced through an affidavit that conflicts with an earlier sworn statement. *Cf. Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 976 (4th Cir.1990) (party may not defeat summary judgment by means of an affidavit that contradicts earlier deposition testimony). Moreover, a contrary rule would thwart both this Court's ability to consider motions for relief from a Trust deadline or other action as well as the rationale underlying the Trust's June 29, 1994 bar date.

### III.

Movant is requesting relief from the June 30, 1994, filing deadline and, in so doing, suggests that the Court examine the Trust's authority to establish such a deadline. Before this Court can scrutinize and provide any relief from a Trust decision, "the movant must show facts or issues that elevate the matter above the level of ordinary operations." *Mantush v. Dalkon Shield Claimants Trust*, 197 B.R. 493 (E.D.Va.1994). The June 30, 1994 bar date, unlike the establishment of other Trust deadlines, was more than an administrative decision impacting and facilitating the day-to-day operations of the Trust. To the contrary, the June 30, 1994 deadline was a milestone heralding the commencement of the winding down of the Trust. Moreover, it is now inevitable that there will be a relatively small handful of individuals who have been harmed by the Dalkon Shield who will forever be barred from compensation without any opportunity to even begin the claims resolution process. On this basis, the Court determines that the setting of this ultimate filing deadline was more than a day-to-day operational decision, and bears closer examination by this Court.

An action falls outside the Trust's authority only where the action (1) violates a provision of the Plan or the CRF, or (2) "fails to fully, fairly, and expeditiously serve individual claimants as well as the group of all claimants." *Besag v. Dalkon Shield Claimants Trust*, 197 B.R. 590, 596–97 (E.D.Va. 1994). The latter prong requires that the Trust balance the often competing interests of individual claimants against the aggregate interests of claimants as a group. Given the Trust's superior expertise in resolving claims, it is vested with great discretion to decide the proper balance. *Id.* Where an action sacrifices the interests of a certain individual or group, the action is "outside the authority of the Trust *unless* the Trust shows that the unfairness is absolutely unavoidable given its larger purpose." *Id.* at 597 (emphasis added).

The Trust was put into business to go out of business; thus, the establishment of a final filing deadline was both necessary and inevitable. After a lengthy and generous filing period, including an eight year span during which claimants could file Late Claims, the Trust set such a deadline. As noted above, absent a final filing date, the studies and projections crucial to the Trust's ultimate completion would be rendered in-

complete and inaccurate. While hardship may be occasioned upon individuals in claimant's position, such unfairness is "absolutely unavoidable" in light of the Trust's larger purpose of serving the group of claimants as a whole. *Besag,* 197 B.R. at 597. Indeed, the overall group of claimants, most of whom have been awaiting final resolution of this matter for ten years or more, has an undeniably substantial interest in the winding down of the Trust, which includes the full payment of all Timely Claims, the potential payment of valid Late Claims and the possible distribution of a *pro rata* payment. Accordingly, the Court concludes that the Trust did not act outside its authority in setting the June 30, 1994 bar date.

## IV.

■■■ Movant also challenges the sufficiency of the notice provided by the Trust. Assuming, without deciding, that the Trust is subject to constitutional due process requirements, "[a]n elementary and fundamental requirement of due process in any proceeding ... is notice reasonably calculated, *under all the circumstances,* to apprise interested parties of the pendency of the action." *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (emphasis added); *accord Vancouver Women's Health Collective Soc'y v. A.H. Robins Co., Inc.,* 820 F.2d 1359, 1364 (4th Cir.1987). Where the affected persons are unascertainable, "employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights." *Id.* at 317, 70 S.Ct. at 658. In determining the sufficiency of notice, this Court, given that the Trust's resources are finite, must "balance the needs of notification of potential claimants with the interest of existing ... claimants." *Vancouver Women's Health Collective Soc'y,* 820 F.2d at 1364.

In mid-April, 1994, the Trust published, in sixty-eight newspapers worldwide,[4] a one-day quarter-page "Notice of Final Deadline of June 30, 1994, for Filing Claims with the Dalkon Shield Claimants Trust."[5] This notice specifically, repeatedly and unambiguously warned potential claimants that the deadline was final and that individuals failing to meet the deadline will be "forever barred from asserting any claim". In devising this notice scheme, the Trust balanced the notice interests of *potential* claimants (i.e., individuals with only contingent, unliquidated Late Claims) against the interests of existing timely and late claimants. In so doing, the Trust placed great emphasis on the highly publicized nature of the Robins proceedings, and the numerous and widely disseminated notices regarding the need to file a claim, which were promulgated both during the Robins bankruptcy and after.[6] On these facts, the Trust reasoned that the notice described above was sufficient to warn potential claimants, whose identities could not be ascertained through due diligence, of the June 30, 1994, deadline.

After due consideration of all the circumstances, the Court concludes that the notice provided by the Trust was sufficient to apprise unknown potential Dalkon Shield claimants of the June 30, 1994, deadline to submit their claims to the Trust. If certain women who had used the Dalkon Shield were not aware of the problems associated with the device and the subsequent creation of the Trust by the time the final bar date notice

---

4. A list of these newspapers is attached to the Trust's memorandum as Exhibit F.

5. The Trust also notified directly by mail any potential claimants whose identities were reasonably ascertainable.

6. Specifically, the Trust notes the following considerations:
(1) the international publicity surrounding the Dalkon Shield [both pre- and post-bankruptcy];
(2) the global media campaign conducted by Robins in 1984 as part of its Removal Program; (3) the extensive advertising and public relations notice campaigns conducted by Robins pursuant to this Court's Order regarding the April 30, 1986 bar date; (4) the public notice given in the newspapers and magazines in the United States of the July 18, 1988 confirmation hearing before this Court on the Plan; and (5) the far-reaching newspaper publication of the opportunity to assert claims in the *Breland* class action.
Trust Response Mem. at 10–11.

was published,[7] it is simply not reasonable to conclude that such unknown and unascertainable persons would become informed through another costly mass public relations effort. In short, the Trust made a reasoned and valid decision that sufficient resources, both financial and non-financial, have been expended over a long time period to inform any and all potential claimants of the problems associated with the Dalkon Shield and the opportunity to receive compensation through the claims resolution process. This Court will not second guess that decision.

### V.

■ Finally, Movant seeks relief from the bar date on the basis that her case presents "special circumstances." Movant alleges that she never had any reason to believe that her IUD presented a health risk because she could always feel the string, as directed by her physician. She then notes that she never had any sign of trouble until the March, 1994, surgery.[8]

The Court is sympathetic to Movant's predicament. At the same time, however, the Court determines that her situation does not warrant relief from the June 30, 1994, final deadline. First and foremost, Movant had numerous opportunities to learn about the injuries related to the Dalkon Shield, the possibility of compensation through the Trust, and the claims resolution process, as set forth in Section IV of this Memorandum.[9] Moreover, Movant's surgery and the alleged discovery that her IUD was a Dalkon Shield occurred nearly six-weeks prior to publication of the final deadline, and nearly four months prior to the deadline itself. While there was undoubtedly a recuperative pro-

cess, there was also ample time for her to contact the Trust and file the appropriate documents to attain Late Claim status. Consequently, the Court determines that Movant cannot be granted relief from the Trust's final deadline.

### VI.

■ Despite the reality that hardships will befall a relatively small number of individuals, the Court simply cannot lose sight of the Trust's ultimate goals of winding down and, in that process, compensating claimants to the fullest extent possible. At some point, the claims resolution process must end, and the Trust made a deliberate decision to establish the June 30, 1994, deadline as an integral step in that direction. While the Court does not conclude that the deadline will stand without exception, only under the most exceptional and extraordinary circumstances will such relief be granted. A more flexible rule would be detrimental to the hundreds of thousands of individuals who submitted Timely Claims or valid Late Claims, and would thus be entirely unacceptable.

---

7. As the Trust notes, over twenty-years have passed since the problems associate with the Dalkon Shield were initially revealed.

8. In her revised affidavit, Movant also alleges that she did not know, until her surgery, that the IUD was a Dalkon Shield or that there were ever any problems associated with the Dalkon Shield. For the reasons set forth in Part II of this Memorandum, the Court will not consider these allegations. The Court notes, however, that even if it did include these factors in its evaluation of Movant's motion, the result would not differ.

9. Indeed, Movant's initial affidavit states that she was previously aware that information had been disbursed to women regarding the Dalkon Shield. Even if Movant was unaware that her IUD was a Dalkon Shield, any reasonably prudent woman with an inserted IUD, type unknown, who later learned of serious problems associated with one brand of IUD, presumably would have made an appropriate inquiry of her physician as to any recommended medical tests or treatment.